THE OMAHA NATIONAL BANK, A CORPORATION, APPELLANT, V. ROBERT M. SPIRE, ATTORNEY GENERAL OF THE STATE OF NEBRASKA, APPELLEE.

389 N.W.2d 269

Filed June 20, 1986.   No. 85-471.

James W.R. Brown and Thomas R. Brown of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellant.

Robert M. Spire, Attorney General, and Bernard L. Packett, for appellee.

Charles E. Wright and Kathleen A. Jaudzemis of Cline, Williams, Wright, Johnson & Oldfather, for amicus curiae First National Bank & Trust Company of Lincoln.

Richard L. Berkheimer and Carmen K. Maurer of Knudsen, Berkheimer, Richardson & Endacott, for amicus curiae National Bank of Commerce Trust and Savings Association.

Vard R. Johnson of Broom and Johnson, for amici curiae Hall et al.

KRIVOSHA, C.J., BOSLAUGH, CAPORALE, SHANAHAN, and GRANT, JJ., and McCOWN, J., Retired, and COLWELL, D.J., Retired.

GRANT, J.

This is a declaratory judgment action brought by the plaintiff-appellant, The Omaha National Bank, a corporation, against the defendant-appellee, Attorney General of the State of Nebraska. Omaha National alleged in its petition that it was a corporation organized under the laws of the United States (a national bank) and was authorized to, and did, carry on a banking business in the State of Nebraska, including owning title to real estate as a corporation. Omaha National further alleged that under provisions of the United States Code, it had authority to, and did, act as trustee, executor, administrator, and in other fiduciary capacities; that it has held, and will hold, farm and ranch lands in trust; and that it has been trustee under various wills and has been designated to take title to such lands to administer them.

Omaha National further alleged that on November 2, 1982,

the voters of the State of Nebraska adopted Initiative Petition 300, which purports to amend article XII of the Nebraska Constitution by adding a new section, designated as § 8. As stated in the initiative petition, the enactment provided in part as follows:

That Article XII of the Constitution of the State of Nebraska be amended by adding a new section numbered 8 and subsections as numbered, notwithstanding any other provisions of this Constitution.

Sec. 8(1) No corporation or syndicate shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching.

. . . .

The Secretary of State shall monitor corporate and syndicate agricultural land purchases and corporate and syndicate farming and ranching operations, and notify the Attorney General of any possible violations. If the Attorney General has reason to believe that a corporation or syndicate is violating this amendment, he or she shall commence an action in district court to enjoin any pending illegal land purchase, or livestock operation, or to force divestiture of land held in violation of this amendment.

Omaha National alleged that "[i]f Initiative 300 is construed to apply to the acquisition and administration of farm and ranch lands by [Omaha National] for non-corporate and non-syndicate beneficiaries, it will greatly limit [Omaha National's] ability to carry on a trust business in the State of Nebraska."

Omaha National further alleged that in the course of its business it will, in the future, acquire title to farm and ranch lands and will operate and manage such lands, and will lease or sell such lands without restriction as to whether the lessee or purchaser is a corporation. Omaha National then contends that insofar as Initiative 300 prohibits such activities, Initiative 300 is void.

The petition prayed that Initiative 300 be determined not to apply to Omaha National as a trustee holding farm and ranch

land in trust, or as an owner of such lands, or that Initiative 300 be determined to be void as violating certain provisions of the U.S. and Nebraska Constitutions.

Defendant Attorney General filed his answer admitting the formal allegations of the petition, denying that Initiative 300 was void for any reason, denying the other allegations, and alleging that 12 U.S.C. § 92a (1982) did not authorize the Comptroller of the Currency to authorize Omaha National to act as trustee or administrator (as alleged by Omaha National) when Omaha National was operating in contravention of state law. Defendant prayed that the court declare Omaha National to be a corporation subject to the provisions of Initiative 300.

Each party moved for summary judgment. A single hearing was held on both motions. The evidence before the court consisted of facts properly pled and not denied, the parties' "Stipulation of Facts," and affidavits. The trial court determined there were no genuine issues as to any material facts necessary for the court's decision. After the hearing the court entered its order on the two motions, and on June 6, 1985, entered its judgment finding generally that Initiative 300 was a valid amendment to the Nebraska Constitution and dismissing Omaha National's declaratory judgment action, except that the court found that "the first sentence of subsection (K) of Initiative 300 conflicts with section 29 of the National Bank Act and is void under the supremacy clause of the United States Constitution . . . ." The court declined to determine that the 5-year holding period of Initiative 300 conflicts with the National Bank Act. As to that issue, the court found there was not a justiciable controversy cognizable in a declaratory judgment action.

Omaha National timely appealed, and in this court alleges that the trial court erred in the following specific respects:

1. In not holding that Initiative 300 is statutory in nature and void because it conflicts with Neb. Const. art. I, §§ 1, 3, and 25.

2. In holding that Initiative 300 prohibits Omaha National from holding farm and ranch lands in trust for noncorporate and nonsyndicate beneficiaries.

3. In holding that the evidence was insufficient to show any conflict between the National Bank Act and those portions of

Initiative 300 which purport to prohibit plaintiff from operating, leasing, or selling farm and ranch lands.

4. In failing to hold that the provisions of Initiative 300 which purport to prohibit plaintiff from operating, leasing, or selling farm and ranch lands were in conflict with the National Bank Act and void.

5. In holding that Initiative 300 does not conflict with the equal protection clause of the 14th amendment of the U.S. Constitution.

6. In holding that a justiciable controversy was not presented with respect to the validity of the absolute 5-year limitation imposed by Initiative 300 on the holding of farm and ranch lands by a national bank.

We modify the judgment of the trial court and, as modified, affirm.

We begin our analysis by quoting the observation of the U.S. Supreme Court in *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976): "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . ."

Even more so, in a case involving the people's amendment to their Constitution, we make no attempt to judge the wisdom or the desirability in enacting such amendments. Our task, and the only task we undertake, is to determine whether any of Omaha National's assignments of error have legal merit.

With regard to appellant's contentions, we are aided not only by the briefs of appellant and amici but by a law review article prepared by appellant's counsel. See Brown & Brown, *Constitutionality of Nebraska's Initiative Measure Prohibiting Corporate Farming and Ranching*, 17 Creighton L. Rev. 233 (1984). In opposition thereto, we have available the defendant's brief, and those of certain amici who support the Attorney General's position in part, as well as a responding law review article. See Lake, *Constitutionality of "Initiative 300": An Answer*, 17 Creighton L. Rev. 261 (1984).

We first discuss Omaha National's contention that Initiative 300 is statutory in nature rather than an amendment to the Constitution of the State of Nebraska. The authority of the

people of Nebraska to amend the Constitution of the State of Nebraska is set in article III, § 2, of that Constitution, which provides in part:

> The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature. This power may be invoked by petition wherein the proposed measure shall be set forth at length. If the petition be for the enactment of a law, it shall be signed by seven per cent of the electors of the state and if the petition be for the amendment of the Constitution, the petition therefor shall be signed by ten per cent of such electors. . . . (Adopted, 1912. Amended, 1920.)

Other provisions of article III, §§ 2 and 4, set out further procedural requirements that must be met before an enactment initiated by a petition becomes a part of the statutory law of Nebraska or a part of the Nebraska Constitution, as provided in article III, § 4. There is no allegation in this court that all requirements to enact Initiative 300 were not met, but only an attack on the effect of what was done by the electorate of Nebraska.

The initiative petitions circulated and filed with the Secretary of State of the State of Nebraska stated in part:

> We, the undersigned legal voters of the State of Nebraska . . . respectfully demand that the following constitutional amendment shall be submitted to the voters of the State of Nebraska . . . .

> That Article XII of the Constitution of the State of Nebraska be amended by adding a new section numbered 8 and sub-sections as numbered, notwithstanding any other provisions of this Constitution.

The ballot submitted to the electorate afforded the voters the opportunity to vote "For" or "Against" in response to the question, "Shall a constitutional prohibition be created prohibiting ownership of Nebraska farm or ranch land by any corporation, domestic or foreign, which is not a Nebraska family farm corporation . . . ?" The ballot also stated:

> "A vote FOR will create a constitutional prohibition against further purchase of Nebraska farm and ranch lands by any

corporation or syndicate other than a Nebraska family farm corporation.

"A vote AGAINST will reject such a constitutional restriction on ownership of Nebraska farm and ranch land."

The parties stipulated, "On November 2, 1982, the voters of Nebraska passed Initiative Petition 300 . . . which states that it amends Article XII of the Nebraska Constitution . . . ."

With that background Omaha National would have us determine that Initiative 300 is not a constitutional amendment but a statute passed by the initiative process. Omaha National contends that the Preamble to our Constitution controls and that all amendments to that Constitution must fully comply with the 31 words set out in that Preamble, or such enactments are statutes only and not constitutional amendments. The Preamble states: "We, the people, grateful to Almighty God for our freedom, do ordain and establish the following declaration of rights and frame of government, as the Constitution of the State of Nebraska."

In support of this assignment of error—that Initiative 300 is a statute and not a constitutional amendment—Omaha National first contends that the Preamble to our Constitution is a part of that Constitution and that a proposed enactment must be one that relates directly to the purposes set out in the Preamble, or the enactment is a statute rather than a constitutional amendment. Omaha National reasons that if the proposed enactment is one which changes the "declaration of rights" or the "frame of government," as set out in the Nebraska Constitution Preamble, the enactment is an amendment; if not, it is a statute. Brief for Appellant at 14.

There are at least two reasons we cannot adopt the position of Omaha National in this regard. First, the Preamble is not a part of the Constitution, but only a general statement of purpose. With reference to the Preamble to the U.S. Constitution, the Supreme Court of the United States in *Jacobson v. Massachusetts*, 197 U.S. 11, 22, 25 S. Ct. 358, 49 L. Ed. 643 (1905), stated:

> We pass without extended discussion the suggestion that the particular section of the statute of Massachusetts now in question (§ 137, c. 75) is in derogation of rights

secured by the Preamble of the Constitution of the United States. Although that Preamble indicates the general purposes for which the people ordained and established the Constitution, it has never been regarded as the source of any substantive power conferred on the Government of the United States or on any of its Departments. Such powers embrace only those expressly granted in the body of the Constitution and such as may be implied from those so granted. Although, therefore, one of the declared objects of the Constitution was to secure the blessings of liberty to all under the sovereign jurisdiction and authority of the United States, no power can be exerted to that end by the United States unless, apart from the Preamble, it be found in some express delegation of power or in some power to be properly implied therefrom. 1 Story's Const. § 462.

Similarly, we hold that the State of Nebraska does not derive any of its substantive powers from the Preamble to the Nebraska Constitution. The Preamble cannot exert any power to secure the declared objects of the Constitution unless, apart from the Preamble, such power can be found in, or can be properly implied from, some express delegation in the Constitution.

Secondly, even if the Preamble were considered to be an operative part of our Constitution, it could be amended in any way that any other part of the Constitution may be amended. No part of the Constitution, including the Preamble, is inviolable. To hold to the contrary would give absolute finality to a portion of the Constitution and would thwart the express will of the people when they retained the right to amend their Constitution. The people specifically reserved this right to themselves in §§ 2 and 4 of article III and in article XVI of the Nebraska Constitution.

Even if, as we have held, the provisions set out in the Preamble do not control the determination as to whether Initiative 300 is an amendment or a statute, Omaha National's position remains—that Initiative 300 is a statute and not an amendment. That position is based on a three-step approach: (1) Labeling a legislative measure as a constitutional

amendment does not make it so. (2) A constitutional amendment must deal with fundamental rights or the organization of government. (3) If an initiative measure is statutory in nature, it is, regardless of its label, void if it conflicts with constitutional provisions.

Basic to a consideration of this contention is article III, § 2. The pertinent part of that article is set out above. The people of Nebraska have established a Constitution, and within that Constitution they have set forth a procedure which sets out methods in which they may amend that Constitution. The word "amendment," as defined in Black's Law Dictionary 74 (5th ed. 1979), means: "To alter by modification, deletion, or addition." To the same effect, see Webster's Third New International Dictionary, Unabridged 68 (1981). For this court to hold that we must make an independent judgment as to whether an enactment is an amendment or a statute before it may be considered as an amendment to the people's Constitution would be to give the judicial branch of our government an effective veto over the rights the people have reserved to themselves to change their Constitution.

We can put it no clearer than did the trial court in its memorandum:

> The ultimate source of power in any democratic form of government is the people. Our Nebraska Constitution is a document belonging to the people. Subject only to the supremacy clause of the United States Constitution, the people may put in their document what they will. Even to the shock and dismay of constitutional theoreticians, the people may add provisions dealing with "non-fundamental" rights, as well as provisions bearing the most tenuous of relationships to the notion of what constitutes the basic framework of government. The people may add provisions which legal scholars might decry as legislative or statutory in nature. But the people may do it nonetheless.

We hold that the deciding factor in determining whether a proposed initiative enactment is an amendment or a statute is the manner in which the proposal is denominated in the initiative petition submitted to the voters; provided, of course,

that the provisions of the remainder of article III, § 2, of our Constitution are complied with. In part, that section provides: "If the [initiative] petition be for the enactment of a law, it shall be signed by seven per cent of the electors of the state and if the petition be for the amendment of the Constitution, the petition therefor shall be signed by ten per cent of such electors."

Voters are involved in an initiative proceeding at two separate and distinct times. First, a petition must be signed by electors equal in number to at least 7 percent or 10 percent of "[t]he whole number of votes cast for Governor at the general election next preceding the filing of an initiative or referendum petition . . . ." Neb. Const. art. III, § 4. The signers of an initiative petition are stating that they desire to submit a specific proposed enactment to the voters. By signing the petition, those signers have stated the form of the proposed enactment.

The issue stated on the initiative petition, therefore, sets out the issue which the signers of that petition desire to submit to the electorate. If an initiative petition states that the signers wish to submit an amendment to the Constitution to the voters, the persons who sign such a petition want an *amendment* voted on. If such a petition were to obtain the number of signatures equal to 7 percent of the electors of those who voted in the most recent election for the office of Governor, but not 10 percent of such electors, the petition could not then be submitted to the voters of the state as a proposed *law*. The petition signers have stated that each desires an amendment, not a law, to be voted on.

Similarly, if an initiative petition sets out that the signers want a proposed law submitted to the electorate, the mere fact that the petition contains a number of signatures equaling 10 percent or more of the appropriate number of electors could not mean that the petition could be voted on as an amendment. Each of the signers has stated that that voter wants to have a law voted on—not a constitutional amendment. To hold otherwise would mean that numbers control, and not the specific intention of people signing a petition.

The differences between a law enacted by the initiative procedure and an amendment are obvious and great. While a law enacted by the initiative process may not be vetoed by the Governor of the state (article III, § 4), any law may later be

repealed by the Legislature. An amendment to the Constitution, on the other hand, may not be repealed by the Legislature, but only by the people in a subsequent amendment to the Constitution.

In response to appellant's approach, we hold that under the Nebraska Constitution, in an initiative proceeding, the labeling attached to a proposed enactment determines the nature of the proposed enactment. Otherwise, neither the signers of initiative petitions nor the voters at an election will ever know what they are signing or voting for. There are voters who would not sign a petition for, nor vote for, a constitutional amendment, while they would so sign and vote for an initiative statute, and vice versa.

It then follows that a proposed amendment to our Constitution does not have to deal with fundamental rights or the organization of government, but may deal with any subject.

Such an approach not only leaves the people of this state in charge of their Constitution, as a matter of logic, but follows the stated conclusions of this court and accords completely with past actions of Nebraska voters. In *In re Senate File 31*, 25 Neb. 864, 41 N.W. 981 (1889), we held that a proposed amendment to our Constitution could be submitted to the electorate. The proposed amendment provided that "the manufacture, sale, and keeping for sale of intoxicating liquors as a beverage in this state shall be licensed and regulated by law." *Id.* at 869-70, 41 N.W. at 982. A licensing provision could hardly be considered as affecting a "declaration of rights" or "frame of government," and yet this proposed enactment was held to be proper to submit, as an amendment, to the people for their vote.

Similarly, in 1934 an amendment was submitted to the people, and adopted as article III, § 24, of the Nebraska Constitution, authorizing parimutuel wagering on horseraces. In 1958 the voters again amended the same article to permit bingo games. In short, the people of the State of Nebraska have amended their Constitution in many ways that disinterested observers might well conclude were theoretically legislative in nature.

In so holding that the people of Nebraska may amend their

Constitution in any way they see fit (so long as the amendment does not violate the Constitution of the United States or conflict with federal statutes or treaties), we find ourselves in agreement with the holding of the Supreme Court of the United States in construing amendments of the U.S. Constitution. In *National Prohibition Cases*, 253 U.S. 350, 386, 40 S. Ct. 486, 64 L. Ed. 946 (1920), the Court held, in the face of contentions that the 18th amendment to the Constitution of the United States was really only an exercise of ordinary legislative power:

4. The prohibition of the manufacture, sale, transportation, importation and exportation of intoxicating liquids for beverage purposes, as embodied in the Eighteenth Amendment, is within the power to amend reserved by Article V of the Constitution.

5. That Amendment, by lawful proposal and ratification, has become a part of the Constitution, and must be respected and given effect the same as other provisions of that instrument.

Article V of the U.S. Constitution places only two restrictions on the right to amend that Constitution:

Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

The 18th amendment of the U.S. Constitution did not conflict with the express conditions of the amending process, and the amendment was determined to be part of the Constitution, although legislative in nature.

In *Ex Parte Marsh v. Bartlett*, 343 Mo. 526, 121 S.W.2d 737 (1938), the Missouri Supreme Court upheld an amendment legislative in nature. The amendment provided generally for the repeal of existing fishing statutes and established a "Conservation Commission." The court held that the people had delegated to the Missouri General Assembly the authority to legislate, "subject to the referendum clause, and to propose constitutional amendments by enactment of joint and concurrent resolutions;" and that the people had reserved " 'to

themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independently of the legislative assembly. . . .' " 343 Mo. at 537, 121 S.W.2d at 742. We note also that a contention was made in that case that the amendment was submitted in such a fashion that the voters did not know whether they were voting on a law or an amendment, a concern not present in the instant case, since Initiative 300 was clearly labeled an amendment.

Omaha National contends that earlier Missouri cases have adopted the position first set forth in *State ex rel. Halliburton v. Roach*, 230 Mo. 408, 438-39, 130 S.W. 689, 696 (1910), that "the petitioners [for an initiative amendment to the Missouri Constitution] have no right to undertake to put in the Constitution, which is regarded as the organic and permanent law of the State, mere legislative acts providing for the exercise of certain powers."

Omaha National's reliance on *Halliburton* was shown to be misplaced when in *Union Elec. Co. v. Kirkpatrick*, 678 S.W.2d 402, 404-05 (Mo. 1984), the Missouri Supreme Court stated:

> This holding in *Halliburton*, however, is no longer good law. . . . The 1945 Constitution resolved the *Halliburton* problem by discouraging use of the initiative for constitutional amendments while encouraging use of the process for statutes. "[T]he entire theory of the Committee in drafting this section 58 [now Sec. 50, Art. III] was to try to make it necessary for those people who want to write legislative matters into the constitution to so announce it by placing an enacting clause that says we are trying to write this matter into the constitution, . . ." and getting the additional signatures on the proposed constitutional amendment.

Legislative matters may now be enacted as amendments to the Missouri Constitution subject only to the provision that the initiative show, on its face, that it proposes an amendment to the Constitution. This conclusion squares entirely with our holding herein.

More importantly, we cannot undertake an analysis of the nature of the power reserved in the Constitution of a sister state to amend that Constitution. Such an undertaking is precisely

within the authority of that state's court of last review to determine. Moreover, we note that the Supreme Court of Missouri, in *Buchanan v. Kirkpatrick*, 615 S.W.2d 6 (Mo. 1981), had already rejected the argument that legislative matters cannot become a part of the Missouri Constitution and held that the fact an amendment is legislative in character does not invalidate an amendment and that the question of how far a constitutional amendment can go into the particulars of government is one of policy only.

Insofar as the Missouri cases place weight on the fact that one of the factors determining whether an enactment is an amendment or a statute is the question of whether the enactment is temporary in nature, we note that Md. Const. art. XIV, § 1A, specifically provides for constitutional amendments "that are of limited duration" and must "state the date upon which or the circumstances under which those provisions shall expire." It is clear that not all states agree with Omaha National's statement that "[t]he very purpose of a constitution is to set out the basic general principles against which all legislative, executive and judicial action must be measured." Brief for Appellant at 22.

The position we take herein has been adopted by the Supreme Court of Michigan in *City of Jackson v. Com'r of Revenue*, 316 Mich. 694, 26 N.W.2d 569 (1947), and by the Supreme Court of Oklahoma in *In re Initiative Petition Number 259, etc.*, 316 P.2d 139 (Okla. 1957).

Since we have determined that Initiative 300 was adopted as an amendment and not a statute, we need not consider whether Initiative 300, if a statute, is in violation of our Constitution.

If it then be contended that even if Initiative 300 is an amendment to our Constitution, it conflicts with that same Constitution, we find that position without merit. We agree with the Massachusetts Supreme Judicial Court, which stated in a footnote simply that "[i]t is difficult to comprehend how the proposed constitutional amendment can be 'unconstitutional' under our Constitution." *Answer of the Justices*, 375 Mass. 847, 849 n.2, 377 N.E.2d 915, 916 n.2 (1978).

Similarly, in *Floridians Against Casino Takeover v. Let's*

*Help*, 363 So. 2d 337, 341-42 (Fla. 1978), the Supreme Court of Florida stated:

> "[C]onflict" with existing articles or sections of the Constitution can afford no logical basis for invalidating an initiative proposal. Such an assertion ignores established patterns of constitutional construction. When a newly adopted amendment does conflict with preexisting constitutional provisions, the new amendment necessarily supersedes the previous provisions. Otherwise, an amendment could no longer alter existing constitutional provisions and the amendment process might, in every case, be frustrated by the judicial determination that a given proposal conflicts with other provisions.

It would completely subvert our role as one of the three branches of government established by the people in the Constitution to expand our jurisdiction to tell the voters of this state that although the Constitution states that the people have reserved the power to amend that Constitution, they may only amend it in ways that we determine are fundamental or have something to do with our "organic" law. Omaha National's first assignment is without merit. We affirm the holding of the trial court that Initiative 300 is an amendment of the Constitution of Nebraska.

We note that in article XII, § 8, of the Nebraska Constitution, as printed in volume 2 of the Revised Statutes of Nebraska (Reissue 1985), and in the "Constitution of the State of Nebraska," as edited and distributed by the Secretary of State of the State of Nebraska, the first introductory passage—"That Article XII of the Constitution of the State of Nebraska be amended by adding a new section numbered 8 and subsections as numbered, notwithstanding any other provisions of this Constitution"—has been omitted. The additional words to article XII, § 8, should be added to the printed Constitution. Those words are an integral part of the amendment as adopted.

Omaha National contends in its second assignment of error that while the terms of Initiative 300 (whether the enactment be considered a statute or a constitutional amendment) might purport to prohibit corporations from owning farm and ranch

lands, Initiative 300 was not intended to, and did not, prohibit national banks from holding farmlands in trust for individual beneficiaries. Since we have determined that Initiative 300 is a constitutional amendment rather than a statute, Omaha National's contention will be considered in that light only.

The part of Initiative 300 relevant to this assignment of error states in article XII, § 8(1):

No corporation . . . shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching.

Corporation shall mean any corporation organized under the laws of any state of the United States or any country or any partnership of which such corporation is a partner.

Omaha National's position is that this language along with "other provisions of the enactment and the other documents that were a part of the initiative process show an intent to prohibit an ownership interest and not to regulate the trust business of a national bank." Brief for Appellant at 10. We do not agree.

We must first address the issue of how this court should approach the issue of determining the intent of the voters when they adopted Initiative 300. The fact that an initiative petition was voted on controls the determination of this issue.

We have often held that the intent of the Legislature may be considered when this court is determining the meaning or effect of a statute. *In re Boundaries of McCook P.P. Dist.*, 217 Neb. 11, 347 N.W.2d 554 (1984).

Further, we have stated, "In construing provisions of a constitution, courts may examine debates and proceedings of a constitutional convention to determine the framers' intended meaning of words, phrases, or clauses of a constitution." *Jaksha v. State*, 222 Neb. 690, 693, 385 N.W.2d 922, 924 (1986). See, also, *Elmen v. State Board of Equalization and Assessment*, 120 Neb. 141, 231 N.W. 772 (1930).

With regard to an initiative enactment, however, a different rule must apply. There is no meaningful way to determine the intent which motivates voters to sign a petition for the

submission of an enactment, nor is there any real way to determine the intent of those voters who vote for the adoption of an enactment. The motivations and mental processes of the voter in Verdigre or the elector in Elkhorn cannot be determined—except from the words of the enactment itself. Beyond that, all that can be known by this court is that the voters have been subjected to tornadolike winds in voting on this highly political question. We hold that the intent of the voters adopting an initiative amendment to the Nebraska Constitution must be determined from the words of the initiative amendment itself.

What we do know, and may use in our interpretations of a part of our Constitution, are the historical or operative facts in connection with the adoption of a constitutional amendment. As stated in *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 341, 37 N.W.2d 502, 507 (1949), "It is permissible to consider the facts of history in determining the meaning of language of the Constitution."

In considering Omaha National's contentions in this regard, we must consider the words of the initiative petition, as the initiative petition signers submitted those words to the voters for enactment, and the words actually voted on and adopted by the voters. Any other approach would only be a selective choice, made by a reviewing court, of diametrically opposed allegations made by those favoring or opposing the enactment. The intent with which a statute is adopted by a small number of legislators, or even the intent with which a larger group in a constitutional convention adopts a Constitution, or a part thereof, may be divined from examination of the proceedings of such groups, but it is impossible to divine the intent of myriad voters who adopt a constitutional amendment.

We turn, then, to the words of the enactment itself. Initiative 300 states, "No corporation . . . shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state . . . ." It is not possible to conceive of stated words with much broader meaning.

The voters have placed in their Constitution words which forbid a corporation to obtain, in any way, any kind of interest

("legal, beneficial, or otherwise") in certain real estate. It is clear that any interest obtained by a corporation must be *something*. Initiative 300 forbids corporations to obtain any interest in the described sort of real estate, and specifically forbids Omaha National from obtaining an interest in such land as trustee. There is no point in setting out a scholarly distinction between the interests represented by legal and equitable titles, because the acquisition of either, in certain real estate, is forbidden by Initiative 300.

Insofar as Omaha National attacks the applicability of Initiative 300 to it as a trustee, we note the provisions of 12 U.S.C. § 92a(a). That statute sets out the authorization permitting Omaha National, as a national bank, to act as a trustee, and provides in part:

> The Comptroller of the Currency shall be authorized and empowered to grant by special permit to national banks applying therefor, *when not in contravention of State or local law*, the right to act as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, committee of estates of lunatics, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which come into competition with national banks are permitted to act under the laws of the State in which the national bank is located.

(Emphasis supplied.)

The Congress of the United States has clearly recognized the applicability of state law to national banks operating under the right to act as trustee.

Omaha National's second assignment of error is without merit.

Omaha National's third and fourth assignments of error may be considered together, since both concern the relationship between Initiative 300 and the National Bank Act. Omaha National's position is that Initiative 300 conflicts with the National Bank Act and is therefore void. We do not agree.

The part of the National Bank Act relied on by Omaha National is set out in 12 U.S.C. § 29 (1982) and provides:

> A national banking association may purchase, hold,

and convey real estate for the following purposes, and for no others:

First. Such as shall be necessary for its accommodation in the transaction of its business.

Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it.

But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years except as otherwise provided in this section.

For real estate in the possession of a national banking association upon application by the association, the Comptroller of the Currency may approve the possession of any such real estate by such association for a period longer than five years . . . .

The point raised by Omaha National has been before the courts on many occasions. All parties recognize the underlying law that the statutes or constitutions of a state may not be in violation of the U.S. Constitution or U.S. statutes enacted pursuant to that Constitution. The application of that principle to the relation of national banks with state law has been the subject of much litigation.

What is now called the National Bank Act was first proposed by the Congress of the United States in 1864. In 1869, in the case of *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 19 L. Ed. 701 (1869), the Supreme Court of the United States considered the application of state laws to a national bank. The Court held that a Kentucky law requiring national banks to pay a state tax on shares of their stock was valid. In so holding, the Court stated at 361-62:

[I]t certainly cannot be maintained that banks or other corporations or instrumentalities of the government are to be wholly withdrawn from the operation of State

> legislation. . . . [T]he agencies of the Federal government are only exempted from State legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government.

In 1896, in *McClellan v. Chipman*, 164 U.S. 347, 356-57, 17 S. Ct. 85, 41 L. Ed. 461 (1896), the U.S. Supreme Court stated:

> Two propositions have been long since settled by the decisions of this court:
>
> First. National banks "are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." *National Bank v. Commonwealth*, 9 Wall. 362.

The second proposition was that national banks are instrumentalities of the federal government, created for a public purpose, and are subject to the paramount authority of the federal government.

The *McClellan* Court, in order to forbid preferences between creditors, affirmed the Massachusetts Supreme Judicial Court which had held that national banks (which were authorized by federal law to take real estate for certain purposes) were subject to the Massachusetts law which forbade a transfer of property in case of insolvency. The U.S. Supreme Court then set out a position which was later described as "The Policy of Competitive Equality." The Court stated at 358:

> No function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the State are subjected, one of which limitations arises from the provisions of the state law which in case of insolvency seeks to forbid preferences between creditors.

It was after the 1933 and 1935 amendments to the National

Bank Act in which 12 U.S.C. § 36(c)(1) and (2) (1982) were adopted that the Supreme Court used the phrase "The Policy of Competitive Equality." In *First Nat. Bank v. Walker Bank*, 385 U.S. 252, 261, 87 S. Ct. 492, 17 L. Ed. 2d 343 (1966), the Court stated:

> *The Policy of Competitive Equality*
>
> It appears clear from this resume of the legislative history of § 36(c)(1) and (2) that Congress intended to place national and state banks on a basis of "competitive equality" insofar as branch banking was concerned. . . . To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864.

In *Walker Bank* the Supreme Court affirmed the validity of a Utah statute regulating the location of branches of national banks operating in Utah.

In *First National Bank v. Dickinson*, 396 U.S. 122, 131, 90 S. Ct. 337, 24 L. Ed. 2d 312 (1969), the Supreme Court set out a brief background to the National Bank Act when it stated:

> At the outset we note that, while Congress has absolute authority over national banks, the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks. Congress has deliberately settled upon a policy intended to foster "competitive equality." *Walker Bank*, 385 U.S., at 261. State law has been utilized by Congress to provide certain guidelines to implement its legislative policy.
>
> We need not review the legislative history of the McFadden Act and prior national bank legislation as it relates to this problem; that task was performed by Mr. Justice Clark in *Walker Bank, supra*, where a unanimous Court noted that the McFadden Act was a response to the competitive tensions inherent in a dual banking structure where state and national banks coexist in the same area. That Act reflects the congressional concern that neither system have advantages over the other in the use of branch banking.

The thrust of the National Bank Act is to preserve equality of banking opportunity. Initiative 300 applies in an identical

manner to both state banks and national banks. Insofar as it affects national banks, Initiative 300 does not in any way affect the competitive balance the Congress of the United States attempts to maintain between state banks and national banks. To apply the provisions of Initiative 300 to state banks and not to national banks would obviously give an advantage to the national banks and thus tip the scales in favor of the national bank. Such a result would be contrary to the congressional concern expressed in *First National Bank v. Dickinson, supra,* that neither system have an advantage.

We hold that Initiative 300 is not invalid in its application to national banks and the rights such banks enjoy by reason of their federal origins. Article XII, § 8(1), of the Nebraska Constitution does not conflict with 12 U.S.C. § 29.

Omaha National's fifth assignment of error contends that the trial court erred in holding that Initiative 300 does not conflict with the equal protection clause of the 14th amendment of the U.S. Constitution. Omaha National forthrightly states in its brief that while it believes that Initiative 300 conflicts with the U.S. Constitution in that respect, it recognizes that

> the present United States Supreme Court has in effect said that in economic matters it does not wish to be bothered by equal protection and due process claims and that parties should look for relief to the corresponding equal rights and due process provisions of their state constitutions.

Brief for Appellant at 31.

We agree with that statement. In *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976), the U.S. Supreme Court stated:

> When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. See, *e. g., Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356 (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification

challenged be rationally related to a legitimate state interest.

In the instant case involving an amendment to the Nebraska Constitution, it would appear that the U.S. Supreme Court would even more readily defer to the state constitutional determination as to the desirability of particular constitutional discriminations.

Involved, of course, is the discrimination between those who may own certain real estate. Corporations have been held to be persons, and the voters of Nebraska have decided that corporations should be treated differently than other persons and not be entitled to own certain real estate in Nebraska.

As far as the determination that Initiative 300 concerns a "legitimate state interest," in 1984 the U.S. Supreme Court in *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241-42 n.5, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984), stated:

> After the American Revolution, the colonists in several States took steps to eradicate the feudal incidents with which large proprietors had encumbered land in the Colonies. See, *e. g.*, Act of May 1779, 10 Henning's Statutes At Large 64, ch. 13, § 6 (1822) (Virginia statute); Divesting Act of 1779, 1775-1781 Pa. Acts 258, ch. 139 (1782) (Pennsylvania statute). *Courts have never doubted that such statutes served a public purpose.* See, *e. g., Wilson v. Iseminger*, 185 U.S. 55, 60-61 (1902); *Stewart v. Gorter*, 70 Md. 242, 244-245, 16 A. 644, 645 (1889).

(Emphasis supplied.)

Even more directly in point, the U.S. Supreme Court considered a North Dakota initiative measure, enacted as adopted in 1932, entitled "An Act prohibiting corporation farming and relating to corporations acquiring and holding real estate not necessary in the operation of their business." The North Dakota Supreme Court fully considered the act in *Asbury Hospital v. Cass County*, 72 N.D. 359, 7 N.W.2d 438 (1943), *appeal after remand* 73 N.D. 469, 16 N.W.2d 523 (1944), and held the act valid and that it did not "deny any right guaranteed to it [the Asbury Hospital] by the several provisions of the Constitution of the United States and the Constitution of the State of North Dakota . . . ." 73 N.D. at 473, 16 N.W.2d at

525.

The Supreme Court of the United States affirmed the North Dakota Supreme Court in *Asbury Hospital v. Cass*, 326 U.S. 207, 214, 66 S. Ct. 61, 90 L. Ed. 6 (1945), and stated:

> We cannot say that there are no differences between corporations generally and those falling into the excepted classes which may appropriately receive recognition in the legislative application of a *state policy against the concentration of farming lands in corporate ownership.*

(Emphasis supplied.)

We hold that article XII, § 8(1), of the Nebraska Constitution does not conflict with the due process or equal protection clause of the 14th amendment of the U.S. Constitution.

With regard to Omaha National's last assignment of error—that the trial court erred in holding that a justiciable controversy was not presented with respect to the validity of the 5-year limitation imposed by Initiative 300 on the holding of farm and ranch lands by a national bank—a confusing situation confronts this court.

First of all, we note that Omaha National's contention is stated too broadly. Initiative 300 does not purport to divest Omaha National of any farm or ranch land it owned at the time of the enactment of Initiative 300. The initiative provided, as stated in Neb. Const. art. XII, § 8(1):

> These restrictions shall not apply to:
>
> (D) Agricultural land, which, as of the effective date of this Act, is being farmed or ranched, or which is owned or leased, or in which there is a legal or beneficial interest in title directly or indirectly owned, acquired, or obtained by a corporation or syndicate, so long as such land or other interest in title shall be held in continuous ownership or under continuous lease by the same such corporation or syndicate . . . .

Initiative 300 did apply restrictions to the purchase of, or holding title to, farm and ranch lands after the enactment became effective, but provided for certain exemptions. Only two exemptions included a provision that farm and ranch lands acquired under certain conditions could be held for a maximum

of 5 years—subsections (J) and (K) of article XII, § 8(1). Those subsections provide:

These restrictions shall not apply to:

(J) Agricultural land acquired or leased by a corporation or syndicate for immediate or potential use for nonfarming or nonranching purposes. A corporation or syndicate may hold such agricultural land in such acreage as may be necessary to its nonfarm or nonranch business operation, but pending the development of such agricultural land for nonfarm or nonranch purposes, not to exceed a period of five years . . . .

These restrictions shall not apply to:

(K) Agricultural lands or livestock acquired by a corporation or syndicate by process of law in the collection of debts, or by any procedures for the enforcement of a lien, encumbrance, or claim thereon, whether created by mortgage or otherwise. Any lands so acquired shall be disposed of within a period of five years . . . .

We hold that the trial court was correct in declining to decide Omaha National's underlying position as set out in this court in Omaha National's last assignment of error. That position is not expressly set out in the petition in this case, but, if broadly construed, the petition may be said to contend that the 5-year limitation on acquisitions conflicts with 12 U.S.C. § 29. Section 29 also contains a 5-year limitation on certain real estate holdings of a national bank, but provides an additional 5-year period which the U.S. Comptroller of the Currency *may* grant under certain conditions.

Both Initiative 300 and 12 U.S.C. § 29 place an initial limit of 5 years as the limit of time a national bank (in the case of 12 U.S.C. § 29) or any corporation (as provided in Initiative 300) may hold lands acquired in certain ways. It is then provided in 12 U.S.C. § 29 that an extension of this period—up to 5 years—may be granted on certain conditions.

Initiative 300, by its terms, operates to give a corporation at least an additional 2 years, when it provides as follows:

If the Attorney General has reason to believe that a corporation or syndicate is violating this amendment, he

or she shall commence an action in district court to enjoin any pending illegal land purchase, or livestock operation, or to force divestiture of land held in violation of this amendment. The court shall order any land held in violation of this amendment to be divested within two years. If land so ordered by the court has not been divested within two years, the court shall declare the land escheated to the State of Nebraska.

It is clear that at this time Omaha National does not present sufficient facts to raise the issue which it attempts to present. Initiative 300 became effective on November 29, 1982. Omaha National has not been in a position to ask the Comptroller of the Currency for additional time to hold lands under these particular types of acquisition. There has not been time for the Attorney General to institute an action for divestiture, and that action would have to culminate in a court order. The question presented is too theoretical to determine in a declaratory judgment action at this time.

In addition, we have often held that "the granting of declaratory relief is discretionary." *Sim v. Comiskey*, 216 Neb. 83, 84, 341 N.W.2d 611, 612 (1983). The trial court did not abuse its discretion in declining to determine this issue, at this time, in a declaratory judgment action.

There remains one point to be decided. The trial court held:

In its Order on Motions for Summary Judgment, the Court granted the Bank's motion for summary judgment to the extent of holding that the first sentence of subsection (K) of Initiative 300 conflicts with section 29 of the National Bank Act and is void under the supremacy clause of the United States Constitution to the limited extent that such sentence fails to exempt from restriction of Initiative 300 the acquisition by a national bank of Nebraska agricultural land "conveyed to it in satisfaction of debts previously contracted in the course of its dealings" or "purchased to secure debts due to it."

We note, as plain error, the trial court's holding in this regard. Neb. Ct. R. of Prac. 9D(1)d (rev. 1983). We held in *Linn v. Linn*, 205 Neb. 218, 221, 286 N.W.2d 765, 767 (1980), quoting from *Wittwer v. Dorland*, 198 Neb. 361, 253 N.W.2d 26 (1977):

" 'However, this court reserves the right to note and correct plain error which appears on the face of the record in furtherance of the interests of substantial justice.' "

We hold that the trial court erred in holding subsection (K) of article XII, § 8(1), void. First, we have determined, as set out above, that Initiative 300 does not conflict with 12 U.S.C. § 29. Second, it is not possible to declare an exemption to an amendment unconstitutional (and that is how the denominated part of Initiative 300 in subsection (K) begins: "These restrictions shall not apply to:") because it is not broad enough, when the amendment itself is constitutional. Third, and most importantly, subsection (K) does not provide for lesser purposes for which a national bank may hold land under certain conditions than does 12 U.S.C. § 29. That section is set out above and generally provides that a national bank may hold real estate, with regard to lending transactions, in three situations: (1) when the land is mortgaged for debts previously contracted; (2) when land is conveyed to the bank in satisfaction of debts; and (3) when land is purchased at sales under judgments or mortgages, or purchased to secure debts due the bank.

Subsection (K) of Initiative 300, which is set out above, generally sets out the same provisions in the broadest language when it states that the Initiative 300 restrictions shall not apply to lands "acquired by a corporation or syndicate by process of law in the collection of debts, or by any procedures for the enforcement of a lien, encumbrance, or claim thereon, whether created by mortgage or otherwise."

We hold that Initiative 300 is not unconstitutional in any respect submitted to the trial court. The judgment of the trial court is modified as stated herein, and as modified, is affirmed.

AFFIRMED AS MODIFIED.