REQUESTED BY: State Senator Rate Witek
You have requested the opinion of the Attorney General on a series of legal questions related to a proposed constitutional amendment to Article VII, § 1 of the Nebraska Constitution which may be introduced in the upcoming session of the Nebraska Legislature. The proposed amendment is as follows:
 Quality education is essential to the survival of a free society and is a fundamental right of each individual. It is the paramount duty of the State to provide for the thorough and efficient education for all individuals between the ages of five and twenty-one years who are enrolled in the common schools of the State. The Legislature may provide for the education of other persons in educational institutions owned and controlled by the state or a political subdivision thereof.
We will address each question in the order presented.
1. If such amendment were enacted, is it likely that theNebraska Supreme Court would rule that education has aconstitutionally-protected status as a fundamental constitutionalright? What judicial analysis would the Nebraska Supreme Courtlikely employ in analyzing statutes because of this constitutionalprovision?
No fundamental right to education exists under the United States Constitution. San Antonio Indep. Sch. Dist. v. Rodriguez,411 U.S. 1, 38-40, 93 S.Ct. 1278, 1299-1300 (1973). However, individual States can create such rights under their State constitutions. The proposed amendment purports on its face to make "quality education" a fundamental right, and would almost certainly be found by a court to effectively create such a right. SeeSeattle Sch. Dist. No. 1 of King County. v. State, 585 P.2d 71
(Wash. 1978).
Elevating "quality education" to a fundamental right would raise it in status to the level of the right to engage in free speech or to exercise religion free of governmental interference.Doe v. Superintendent of Sch. of Worchester, 653 N.E.2d 1088,1096 n. 4 (Mass. 1995) (quoting Kirby v. Edgewood Indep. Sch.Dist., 761 S.W.2d 859, 863-864 (Tex.Ct.App. 1988), rev'd on other grounds, 777 S.W.2d 391 (Tex. 1989)). Legal actions brought to enforce fundamental constitutional rights pursuant to state due process or equal protection clauses are adjudicated using the highest level of judicial review — strict scrutiny. Under strict scrutiny, a compelling state interest is necessary to justify any impingement on a fundamental constitutional right, rather than just some rational relationship to a legitimate state purpose. Robotham v.State, 241 Neb. 379, 382, 488 N.W.2d 533 (1992). The Nebraska Supreme Court has noted that "In any challenge to a statute under either the Due Process Clause or the Equal Protection Clause, thedegree of judicial scrutiny to be focused on the statute is a"dispositive question" (citation omitted) . . . since "if astatute is subject to strict scrutiny the statute always or nearly always. . . is struck down. . ." Id. at 382. (emphasis added).
Thus, application of strict scrutiny has far-reaching implications. For example, if education were a fundamental right, students caught violating school weapon policies would likely be legally entitled to suspension or provision of alternate education rather than expulsion since expulsion is not the least restrictive alternative. Doe, 653 N.E.2d at 1095.
The impact of making "quality education" a fundamental constitutional right is made evident by examining a recent legal challenge to Nebraska's current school financing system which this office successfully defended. In Gould v. Orr, 244 Neb. 163,506 N.W.2d 349 (1993), the plaintiffs challenged the constitutionality of Nebraska's statutory framework for financing public education on the basis of disparities in funding among school districts in the state. The trial court held that "education is not a fundamental right subject to strict scrutiny," id. at 164, and granted summary judgement for the State. The Supreme Court, noting that the plaintiff's theory of the case was "that unequal funding equals inadequate education," found that the plaintiff failed to state a cause of action and dismissed the case. A dissenting judge noted that if education was a fundamental right, then any legislation affecting free instruction would be subject to strict scrutiny.Id. at 170, (White, J., dissenting in part). Another dissenting judge noted allegations of lower wages paid to teachers in poorer districts; access to fewer resources such as libraries, updated workbooks and counselors; and the unavailability of advanced courses in math, science, and foreign languages for students in poorer districts. He stated, "These allegations alone would show the inadequacy of the education received by students within poorer districts which result from the alleged economic disparities." Id.
at 163 (Lanphier, J., dissenting).
It is clear, then, that making "quality" education a fundamental constitutional right would have dramatic legal consequences. Any legislation affecting that right would be subject to strict judicial scrutiny.
2. Would this be the first time that minors have beenempowered with individual rights of any kind in the State ofNebraska? Do you know of any other fundamental rights granted tominors by the Nebraska Constitution?
We are not aware of any other instances where fundamental rights are granted specifically to minors in the Nebraska Constitution. Individual rights are, of course, generally applicable to minors as well as adults. Bellotti v. Baird, 443 U.S. 622,633 (1979); Application of Gault, 387 U.S. 1, 13 (1967).
3. In the first sentence of the new amended language, a"quality education" is the right of "each individual." In thesecond sentence of the new amended language, a "thorough andefficient education" is provided to "all individuals between theages of five and twenty-one years who are enrolled in the commonschools of the State." The second sentence seems to place aqualification on "individuals" and the first sentence does not seemto have any qualification on "individual." Would the firstsentence apply to each individual in the State of Nebraskaregardless of age and regardless of whether the individual isenrolled in a common school? In other words, does everyone have afundamental right to a quality education?
It is a fundamental principle of constitutional interpretation that each and every clause within the Constitution has been inserted for a useful purpose. Day v. Nelson, 240 Neb. 997, 1000,485 N.W.2d 583 (1992). It is our opinion that the first clause is a freestanding provision which would grant a fundamental right to a "quality" education to each individual in the State, not just those ages five to twenty-one in the common schools[1].
4. Since this amended language does not define "qualityeducation" how would it likely be defined? In defining "qualityeducation" would sections 79-4,140.01 and 79-4,140.02 of theNebraska Revised Statutes that reference "quality education" or anadministrative definition by the Nebraska Department of Educationplay an important role?
How "quality education" would be defined is ultimately up to the Nebraska Supreme Court. See Calabro v. City of Omaha, 247 Neb. 955,972, 531 N.W.2d 541 (1995); Seattle Sch. Dist. No. 1 of KingCity v. State, 585 P.2d 71, 87 (Wash. 1978) ("[T]he judiciary has the ultimate power and the duty to interpret, construe and give meaning to words, sections and articles of the constitution."). Thus, the courts rather than the Legislature or the local school boards would ultimately decide the meaning and extent of a "quality education." We note, however, the proposed language is similar to provisions that have led to court intervention in the administration of public schools in other states.
Nebraska's current education clause is a "Category I" clause. William E. Thro, The Role of Language of the State EducationClauses in School Finance Litigation, 79 Ed. Law Rep. 19, 23 n. 24 (1993). This means the clause merely mandates a system of free public schools. "Presumably, as long as the state legislature does not abolish the public school system, there can be no violation of the education clause." Id., at 23.
The proposed language, however, would be a "Category IV" clause. Id., at 25. Such clauses make education one of the most important, if not the top, duty of the state (depending on the language used). Only four states currently have constitutions containing Category IV clauses. Id., at 25 n. 36. The proposed amendment would, in fact, give Nebraska the most stringent education clause in the United States. As discussed above, the meaning of the phrases "quality education" and "thorough and efficient education" in the proposed amendment would be subject to judicial interpretation by Nebraska Courts. In school finance litigation, courts have generally used one of four analyses in construing specific language contained in education clauses of state constitutions: 1) historical analysis of the framers' intent; 2) plain meaning standard of review; 3) assessment of identical or similar language from other state provisions; or 4) a combination of the first three methods. Davidson, An Anatomy ofSchool Funding Litigation, 72 Ed. Law Rep. 627 (1992). The results of potential litigation construing the proposed language could depend upon which analysis the Nebraska Supreme Court utilized.
Although it is difficult to opine with certainty as to how this matter might be assessed by the Nebraska Supreme Court, it is likely that a "plain meaning" analysis would be utilized to construe the terms "quality education," "fundamental right," and "paramount duty." It has been speculated that under such an analysis, "plaintiffs' prospects [would] be substantially increased . . . [since] . . . the plaintiffs will be able to assert that their state requires more than virtually every other state" constitution. The Role of Language, 79 Ed. Law Rep. at 25 n. 36.
Courts in other states have construed similar language, and some guidance may be provided from those decisions. The West Virginia Supreme Court of Appeals defined "thorough and efficient" education as follows:
 It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically. Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work — to know his or her options; (5) work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interest in all creative arts, such as music, theater, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatibility with others in this society.
 Implicit are supportive services: (1) good physical facilities, instructional materials and personnel; (2) careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency.
Pauley v. Kelly, 255 S.E.2d 859, 877 (W.Va. 1979). The court concluded that the thorough and efficient clause "demonstrates that education is a fundamental constitutional right in this State."Id., at 879. Consequently, the court held that strict-scrutiny must be applied to the state financing system and expressed doubt it could be upheld. Id. See also Robinson v. Cahil, 303 A.2d 273,294 (N.J. 1973) (examining the meaning of a "thorough and efficient" system of public schools, and concluding the clause required equal educational opportunity which was violated by funding disparities.)
The Supreme Court of Kentucky defined an "efficient" system of common schools as follows:
 We concur with the trial court that an efficient system of education must have as its goal to provide each and every child with at least the seven following capacities (i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social and political systems to enable the student to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient levels of academic or vocational skills to enable public school students to complete favorably with their counterparts in surrounding states in academics or in the job market.
The essential, and minimal, characteristics of an "efficient" system of common schools, may be summarized as follows:
 1) The establishment, maintenance and funding of common schools in Kentucky is the sole responsibility of the General Assembly.
2) Common schools shall be free to all.
 3) Common schools shall be available to all Kentucky children.
 4) Common schools shall be substantially uniform throughout the state.
 5) Common schools shall provide equal educational opportunities to all Kentucky children, regardless of place of residence or economic circumstances.
 6) Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence.
 7) The premise for the existence of common schools is that all children in Kentucky have a constitutional right to an adequate education.
 8) The General Assembly shall provide funding which is sufficient to provide each child in Kentucky an adequate education.
 9) An adequate education is one which has as its goal the development of the seven capacities recited previously.
Rose v. Council for Better Educ., Inc., 790 S.W.2d 186, 212-213
(1989). The court held that "education is a fundamental right in Kentucky." Id., at 206. The court noted the "great disparity and inadequacy, of financial effort throughout the state," id., at 213, and concluded the state school system was inefficient and thus the entire system was unconstitutional.
In contrast, the Appellate Court of Illinois examined the meaning of "an efficient system of high quality education."Committee for Educational Rights v. Edgar, 641 N.E.2d 602, 605
(Ill.App. 1994). The court held that "The education article does not mandate equal educational benefits and opportunities among the states school districts. . . ." The court held that "[T]he question of the efficiency of the educational system is properly left to the wisdom of the legislature." Id. (quoting Cronin v.Lindberg 360 N.E.2d 360 (Ill. 1976)). However, it should be noted that the court also held that education was not a fundamental right in Illinois, and thus applied a rational basis test rather than strict scrutiny. Id., at 606.
Likewise, the Colorado Supreme Court examined the meaning of "a thorough and uniform" system of public schools. Lujan v.Colorado State Bd. of Educ., 649 P.2d 1005 (Colo. 1982). The court held that education is not a fundamental right under the Colorado constitution, id., at 1017, applied a rational basis test, and upheld the state's school financing system. The court concluded "thorough and uniform does not require that educational expenditures per pupil in every school district be identical." Id., at 1025.See also Allen W. Hubsch, The Emerging Right to EducationUnder State Constitutional Law, 65 Temple L. Rev. 1325, 1337-1341 (1992) (discussing decisions from West Virginia, Washington, New Jersey, Texas and Kentucky). These decisions show the far-reaching legal implications of establishing a fundamental right to quality education.
You also asked about the role of existing Nebraska statutes in defining terms in the proposed amendment. Neb. Rev. Stat. § 79-4,140.02 states, "It is the intent of the Legislature to encourage and support all public schools in this state in order to carry out the state's mission to promote quality education as described inSection 79-4,140.01." (emphasis added). Section 79-4,140.01 provides as follows:
 The Legislature hereby finds and declares that the mission of the State of Nebraska, through its public school system, is to:
 1) Offer each individual the opportunity to develop competence in the basic skills of communications, computations, and knowledge of basic facts concerning the environment, history, and society.
 2) Offer each individual the opportunity to develop higher order thinking and problem-solving skills by means of adequate preparation in mathematics, science, the social sciences, and foreign languages and through appropriate and progressive use of technology;
 3) Instill in each individual the ability and desire to continue learning throughout his or her life;
 4) Encourage knowledge and understanding of political society and democracy in order to foster active participation therein;
 5) Encourage the creative potential of each individual through exposure to the fine arts and humanities;
 6) Encourage a basic understanding of and aid the development of good health habits; and
 7) Offer each individual the opportunity for career exploration and awareness.
While it is possible a court would look to this statute for guidance as to the meaning of "quality education" in the proposed constitutional amendment, a court would not be bound to do so. In fact, if the proposed amendment were placed on the ballot by initiative petition rather than by the Legislature, "the intent of the voters adopting an initiative amendment to the Nebraska Constitution must be determined from the words of the initiative amendment itself." Omaha Nat. Bank v. Spire, 223 Neb. 209, 225,389 N.W.2d 269 (1986). If placed on the ballot by the Legislature, the court could look to the legislative history if it determined the meaning of the words in the amendment are ambiguous. It is possible that legislative debate would contain references to the above quoted statute.
Where the meaning sought is of a particular word or phrase, the court must necessarily look beyond the face of the amendment if the word or phrase is uncertain and undefined in the amendment. The Supreme Court of Washington looked at the history of the state constitutional convention and the dictionary in determining the meaning of its "paramount duty" provision. Seattle Sch.Dist. No.1 of King Cty., 585 p. 2d at 91. Courts may also give some deference to an administrative interpretation by the Department of Education. See, e.g., Vulcraft v. Karnes, 229 Neb. 676,428 N.W.2d 505 (1988).
5. What limits are there to a "quality education" and arethose limits subject to change? For example, if a child suedclaiming that his fundamental right to a quality education wasviolated because his or her school did not have certain classes orfacilities that other schools have, what prevents the NebraskaSupreme Court from ordering that those items be offered in the nameof providing a "quality education?"
The limits of a "quality education" under the proposed amendment would be up to the courts to decide. A real-life example of what can happen when courts intercede to establish educational equality through "quality education" programs comes from litigation involving a school district just two hours outside Nebraska. SeeMissouri v. Jenkins, 115 S. Ct. 2038 (1995). In Jenkins the State of Missouri challenged the District Court's order of salary increases for nearly all staff within the Kansas City, Missouri, School District (KCMSD) and the District Court's order requiring the State to continue to fund "quality education" programs to equalize student achievement levels. Although the case arose in the context of a desegregation order, the case is nonetheless instructive. The following discussion provides examples of programs and requirements imposed by the court:
 First, the District Court ordered that the KCMSD be restored to an AAA classification, the highest classification awarded by the State Board of Education. . . . Second, it ordered that the number of students per class be reduced so that the student-to-teacher ratio was below the level required for AAA standing. . . .
 The District Court also ordered programs to expand educational opportunities for all KCMSD students: full-day kindergarten; expanded summer school; before- and after-school tutoring; and an early childhood development program. . . . Finally, the District Court implemented a state-funded "effective schools" program that consisted of substantial yearly cash grants to each of the schools within the KCMSD. . . . Under the "effective schools" program, the State was required to fund programs at both the 25 racially identifiable schools as well as the 43 other schools within the KCMSD. . . .
 . . . . The total cost for these quality education programs has exceeded $220 million. . . .
 In June 1985, the District Court ordered substantial capital improvements to combat the deterioration of the KCMSD's facilities. . .
 . . . The District Court also required the KCMSD to present further capital improvements proposals "in order to bring its facilities to a point comparable with the facilities in neighboring suburban school districts."
 . . . The District Court rejected what it referred to as the "`patch and repair' approach proposed by the State" because it "would not achieve suburban comparability or the visual attractiveness sought by the court as it would result in floor coverings with unsightly sections of mismatched carpeting and tile, and individual walls possessing different shades of paint.". . . . As of 1990, the District Court had ordered $260 million in capital improvements. . . . Since then, the total cost of capital improvements ordered has soared to over $540 million.
 As part of its desegregation plan, the District Court has ordered salary assistance to the KCMSD. . . . The total cost of this component of the desegregation remedy since 1987 is over $200 million.
 . . . The annual cost per pupil at the KCMSD far exceeds that of the neighboring SSD's or of any school district in Missouri. Nevertheless, the KCMSD, which has pursued a "friendly adversary" relationship with the plaintiffs, has continued to propose ever more expensive programs. As a result, the desegregation costs have escalated and now are approaching an annual cost of $200 million. These massive expenditures have financed.
 "high schools in which every classroom will have air conditioning, an alarm system, and 15 microcomputers; a 2,000-square-foot planetarium; green houses and vivariums; a 25-acre farm with an air-conditioned meeting room for 104 people; a Model United Nations wired for language translation; broadcast capable radio and television studios with an editing and animation lab; a temperature controlled art gallery; movie editing and screening rooms; a 3,500-square-foot dust-free diesel mechanics room; 1,875-square-foot elementary school animal rooms for use in a zoo project; swimming pools; and numerous other facilities". . . .
 Not surprisingly, the cost of this remedial plan has "far exceeded KCMSD's budget, or for that matter, its q authority to tax.". . . The State, through the operation of joint-and-several liability, has borne the brunt of these costs.
Id., at 2042-2045. Thus, the limit on court ordered improvements is not readily defined, and the scenario you describe is well within the realm of possibility, if not probability, in light of the experience in other jurisdictions.
6. If children have such a fundamental right in the NebraskaState Constitution, then what effect will this have on the federalconstitutional right of parents to direct the upbringing andeducation of their children. . .? If a parent chose to send hisor her child to a private/parochial school or teach the child athome through Nebraska Department of Education Rule 13, could thechild claim that such a school choice would be in violation of hisor her right to quality education?
In order to address this question, we will set forth a brief review of the law concerning the parental right to direct their children's education. We will then discuss limitations on this right, and the effect of establishing a fundamental right to quality education.
The Right of Parents to Direct the Education of Their Children
In the landmark Nebraska case Meyer v. Nebraska, the U.S. Supreme Court held that the under the Due Process Clause of the14th Amendment to the U.S. Constitution, parents have a constitutional right to direct the upbringing and education of their children. Meyerv. Nebraska, 262 U.S. 390 (1923). Two years after Meyer the Court struck down an Oregon law which required that all children between the ages of 8 and 16 must attend public school. Pierce v.Society of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510,534-35, 45 S. Ct. 571, 573-74 (1925). In Pierce, the Court stated,
 The fundamental theory of liberty upon which all governments in this union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right coupled with the high duty, to recognize and prepare him for additional obligations.
Id. at 535, 45 S. Ct. at 573. Two years after Pierce, a Hawaiian law was struck down by the Supreme Court because it unfairly limited the alternatives to public school education. Farrington v.T. Tokushige, 273 U.S. 284, 47 S. Ct. 406 (1927).
Limitations on Parental Rights
Subsequent to the above decisions, the Supreme Court held that the right of parents to direct their children's education is subject to certain limitations:
 [T]he family itself is not beyond regulation in the public interest, as against a claim of religious liberty. (citation omitted). And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parents control by requiring school attendance . . . and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's cause of conduct on religion or conscience.
Prince v. Massachusetts, 321 U.S. 158, 166 (1944). Seealso 1973-74 Rep. Atty. Gen. 49, 50 (April 6, 1973).
In a similar tone, the U.S. Supreme Court touched on the issue of home schooling in Board of Education v. Allen 392 U.S. 236,88 S.Ct. 1923 (1968). The Court again discussed limitations on the scope of parental control over their children's education:
 Since Pierce, a substantial body of case law has confirmed the power of the states to insist that attendance at private schools, if it is to satisfy state compulsory-attendance laws, be at institutions which provide minimum hours of instruction, employ teachers of specified training, and cover prescribed subjects of instruction. Indeed, the state's interest in assuring that these standards are being met has been considered a sufficient reason for refusing to accept instruction at home as compliance with compulsory education statutes.
Id. at 245-46, 88 S. Ct. at 1927-28. Although the Court inAllen stated that home education based on mere personal preference may be proscribed, id, many parents base their decision to home school children on their right to freely exercise their religion. Allen did not address this issue, but the Court later did in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526 (1972).
In Yoder, the Court held that the State's interest in universal education is not free from a balancing process when it impinges on other fundamental rights such as those protected by the Free Exercise Clause and the interest of parents with respect to the religious upbringing of their children. Id. at 213-215,912 S.Ct. at 1532-33. The Court also rejected the State's claim that it is empowered, as parens patriae, to insist on secondary education for children regardless of the wishes of their parents. The Court held that the State's interest could not be sustained against a free exercise claim under the facts.
The right of parents to educate their children in the manner which they see fit, when based upon the free exercise of religion, is now commonly accepted among the states. Nebraska's "Rule 13," which permits home schooling based on sincerely held religious beliefs, is consistent with considerations outlined in Yoder. See
Neb. Rev. Stat. § 79-1701 — § 79-1707 (1994). Many courts, however, have decided it is still within their power to ensure that schools, including home schools, meet certain requirements to ensure that students are being well educated. For instance, the Supreme Court of Ohio held that an Ohio law which required the local school superintendent to approve of home schooling programs does not restrict the free exercise of religion. Instead, the court held it furthers the strong governmental interest in the education of its youth. State of Ohio v. Schmidt, 505 N.E.2d 627,629-30 (Ohio 1987).
The Interrelationship Between Parental Rights Under the U.S. Constitution and the Proposed Right to a Quality Education Under the State Constitution
When state law conflicts with federal law, the state law is preempted (to the extent of the conflict) by the federal law under the Supremacy-Clause of the U.S. Constitution. U.S. Const., Art. VI, cl. 2. To the extent that the proposed "fundamental right" of a child to a "quality" education under the State Constitution conflicts with a parent's right to direct the child's upbringing or to exercise their right to practice their faith under the Federal Constitution, the proposed state right would yield to the federal parental right. However, as discussed above, the courts have found many exceptions to the constitutional rights of parents, where education is concerned. Consequently, it is possible a court would not find a conflict between the parents' federal constitutional right to direct their child's education, and the child's fundamental right to a "quality" education under the State Constitution. In such case, the wishes of the child (or of the government operating "in the best interest of the child") would prevail over the parent.
By analogy, the U.S. Supreme Court has discovered a fundamental constitutional right for minor children to have abortions.See Planned Parenthood v. Danforth, 428 U.S. 52, 75,96 S.Ct. 2831, 2844 (1976). Based on this right, a federal circuit court of appeals held that "even though a parent has an interest in the decision whether the minor is to have an abortion, the statehas the power and duty to exclude the parent from the decision-makingprocess if it is determined that exclusion would better serve theminor's welfare. The rights of parents must also yield to the fundamentalrights of their children." Wynn v. Carey,582 F.2d 1375, 1386 (7th Cir. 1978) (emphasis added).
Since the proposed right to a quality education is a fundamental right, it is within the realm of modern jurisprudence that a child could sue his or her parents if they denied him or her a "quality" education. A court could find a particular private, parochial or home school fails to meet the child's fundamental right, and then order the child moved to another school. The Nebraska Supreme Court has already stated, "Although parents have a right to send their children to school other than public institutions, they do not have the right to be completely unfettered by reasonable regulations as to the quality of theeducation furnished." State ex rel. Douglas v. Faith BaptistChurch, 207 Neb. 802, 817, 301 N.W.2d 571 (1981) (emphasis added)[2]. Furthermore, current Nebraska law provides that any private, denominational, or parochial school which fails, refuses, or neglects to conform to and comply with the current statutory requirements for such schools (including specified course of instruction) may be closed and the pupils "required to attend the public school of the proper district as provided by law in like manner as though there were no such private, denominational, or parochial school." Neb.Rev.Stat. § 79-1706 (1994) .
Finally, because the proposed right to a "quality education" is a fundamental constitutional right, it is conceivable that courts could mandate a "judicial bypass" procedure for children who wish to have a court determine whether they are receiving a "quality education" in the event they do not approve of their parents' choice of schools. Such a procedure is already the law in Nebraska with respect to a minor's fundamental right to an abortion. See Neb. Rev. Stat. § 71-6903 (Cum.Supp. 1994).
7. In the second sentence of the new language, the state'sduty to provide a thorough and efficient education is a "paramountduty." What is a paramount duty?
Research indicates that the only State with a comparable provision is the State of Washington. Article 9, § 1 of the Washington Constitution provides, "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders. . . ." The meaning of "paramount duty" was determined by the Washington Supreme Court in SeattleSch. Dis. No. 1 of King City v. State, 585 P.2d 71 (Wash. 1978).
The court in Seattle Sch. Dis. No. 1 held that this provision "does not merely seek to broadly declare policy, explain goals, or designate objectives to be accomplished. It is declarative of a constitutionally imposed duty." Id., at 85. The court further held this duty has not been directed solely to the Legislature.Id., at 86 (concluding the courts could enforce the "paramount duty").
The court concluded that "`paramount' is not a mere synonym of `important'. Rather, it means superior in rank, above all otherschief preeminent, supreme and, in fact, dominant." Id., at 91 (emphasis added). The court further held:
 By imposing upon the State a paramount duty to make ample provision for the education of all children residing within the State's borders, the constitution has created a "duty" that is supreme, preeminent or dominant. Flowing from this constitutionally imposed "duty" is its jural correlative, a correspondent "right" permitting control of another's conduct. Therefore, all children residing within the borders of the State possess a "right," arising from the constitutionally imposed "duty" of the State, to have the State make ample provision for their education. Further, since the "duty" is characterized as paramount the correlative "right" has equal stature.
Id. (emphasis added).
The Seattle court did not stop here, but held, "the State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the market place of ideas." Id., at 94. Underthis provision. the State must provide "fully sufficient funds" for theschools "as a first priority." Id., at 95 (emphasis added). Such funding, the court held, "must be accomplished by means of dependable and regular tax sources. . . ." Id., at 96-97. Finally, this funding is not limited to the revenue derived from sources specified in the constitution. Id.
Thus a "paramount" duty means one that is above all others[3].
8. If this new amended language requires the state to havesuch a "paramount duty" then can the state delegate any authorityto local school districts and local school boards? Would the statebe forced to control the quality of education in each schooldistrict and place local school boards in a subservient role?Also, if education is the "paramount duty" then what effect willthis have on state spending priorities as state government preparesthe state budget?
As to whether the state's paramount duty to provide a thorough and efficient education may be delegated to local school boards, we know of no legal reason that the details of education could not still be handled by local school boards. However, since the proposed amendment transfers responsibility over education funding from local school districts to the State, and imposes the duty to ensure quality education on the State rather than the local districts, the school districts are clearly placed in an inferior role.
The answer to your question regarding state spending priorities is actually provided in the immediately preceding section. Education would be placed in the preeminent position, above all other spending priorities including the historic duty to provide for the public safety. Seattle Sch. Dist. No. 1,585 P.2d at 91[4].
Summary
In summary, the language of the Amendment would leave it to the Nebraska Supreme Court, rather than the Legislature or local school district, to determine what is required for a "quality education." Because the Amendment makes quality education a "fundamental right", differences in spending, equipment, quality of buildings, and differences in programs or teaching methods at different schools may be held unconstitutional. It is likely that Nebraska's current school financing system would be ruled unconstitutional since there are spending differences between school districts. Because education is made the "paramount duty" of the State, education, for purposes described in the Amendment, would apparently have to be fully funded to the satisfaction of the Nebraska Supreme Court before the Legislature would be allowed to spend funds for public health and safety, law enforcement, roads, welfare, or other purposes.
To put it another way, in our opinion, the Amendment you describe would take the ultimate power to make key public policy decisions about education away from the Legislature and local school districts and give that power to the Nebraska Supreme Court.
Sincerely,
 DON STENBERG Attorney General
 Steve Grasz Deputy Attorney General
Approved by:
Don Stenberg 
Attorney General
[1] We also note that one of the sponsors of a similar amendment being proposed by petition, the Center for Rural Affairs, stated in its November 1995 Newsletter that the proposed amendment "Establishes education as a fundamental right for all individuals. . . ." (Nebraska Rural Action Nov. 1995, p. 1) Similarly, this group's October 1995 Newsletter stated the proposed language "Establishes `quality education' as a `fundamental right' of every individual. . . ." (Center for Rural Affairs Newsletter, Oct. 1995 at p. 3.) Although such extrinsic evidence is not likely admissible in court, it nonetheless supports our interpretation.
[2] In Douglas, the State of Nebraska closed a non-compliant church school by utilizing 15 carloads of law enforcement officers on October 19, 1982 to remove parents from the church so that it could be padlocked. The State's original order closing the school was upheld by the State Supreme Court. Douglas, 207 Neb. at 817. The padlocking of the church was later held unconstitutional, but only because the State could have simply prevented school age children from entering. McCurry v. Tesch, 738 F.2d 271, 275 (8th Cir. 1984).
[3] A similar constitutional amendment was defeated by voters in Illinois in 1992. During legislative debate on the proposed amendment, it was acknowledged by proponents of the amendment that the provision would require education to receive priority funding above all other agencies and problems. Senate Debate on SJRConst. Amend. 130, 87th Illinois Gen. Assembly, April 23, 1992 p. 45.
[4] As discussed above, the proposed amendment would create a "Category IV" education clause. See William E. Thro JudicialAnalysis During the Third Wave of School Finance Litigation: TheMassachusetts Decision As a Model, 35 Boston College L. Rev. 597, 606 (May 1994). Under such a clause, "the needs of the public school system must be addressed before the state's needs for roads, parks and other social services." Id.