In re WISCONSIN CO–OPERATIVE MILK POOL.

FIRST WISCONSIN NAT. BANK OF MILWAUKEE et al. v. WISCONSIN CO–OPERATIVE MILK POOL.

No. 7571.

Circuit Court of Appeals, Seventh Circuit.

May 7, 1941.

Bert Vandervelde and Vernon A. Swanson, both of Milwaukee, Wis., for appellants.

Wm. H. Riley and Kenneth M. Orchard, both of Madison, Wis., for appellee.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Petitioners appeal from a judgment of the District Court to the effect that respondent is not such a corporation as may be adjudged bankrupt. Petitioners had filed an involuntary petition alleging that respondent was a business corporation; that it was indebted to petitioner in sums aggregating some $94,000; that it was insolvent and had committed an act of bankruptcy in that it had made a general assignment for the benefit of its creditors. The sole question presented on review is whether respondent is within Section 4, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 22, sub. b, providing, with certain exceptions not here important, that estates of "moneyed," "business," or "commercial" corporations may be administered in bankruptcy.

Petitioner was organized under Chap. 185 of the Wisconsin statutes controlling organization of co-operatives and their transaction of business. According to that act "co-operative basis" means that the net proceeds from "the business" shall be distributed to patrons in proportion to the "volume of business" transacted by them with the corporation. Net proceeds are defined as "total proceeds minus expense of operation and cost of goods sold." Co-operative corporations are organized and may dissolve in the same manner as ordinary corporations. They may issue shares of stock or be organized without capital stock. They are granted all powers of other corporations and, in addition, may make contracts with members relating to the purchase and sale of products. The statute mentions specifically "transacting business"; "computation of net proceeds"; creation of "reserve fund"; "net proceeds of the business"; distribution of "all remaining net proceeds," in proportion to the "volume of business" conducted with the association. It provides for the distribution of reserves, surpluses and other assets in case of liquidation. A cooperative is required to give to the Secretary of the State annually "a statement as to its business." It is subject to the general corporation laws of Wisconsin except in case of specific exemption. The state recognizes that a co-operative will engage in business and endeavor to realize profits and supplies it with all the agencies, instrumentalities and functions necessary to the transaction of business, including buying, selling, maunfacturing, incurring debts, borrowing money, and distribution of profits. Such corporations differ from others not in corporate function but only in that the profits, instead of being distributed to stockholders, are allotted to patrons ratably in proportion to the amount of business transacted with the latter. Revised Statutes of Wisconsin, Section 185.01 to 185.23.

The articles of organization under which respondent was incorporated expressly included the following purposes: buying, manufacturing, processing, selling and handling milk and its by-products, equipment, supplies and commodities of every kind, either in its own behalf or as agent for its members. It had power to buy, sell, mortgage, lease or otherwise dispose of real and personal property, to borrow money for all corporate purposes without limit, to pledge and mortgage and otherwise incumber any of its assets, to do all other things designed to promote co-operative dealings in the in-

terest of its patrons; to carry out and otherwise turn to account contracts of every nature and kind and to do anything and everything suitable and convenient for the accomplishment of any of the express purposes.

The court [35 F.Supp. 787, 789], found that respondent was "engaged in business pursuits"; that it received "income from various sources," and that its principal activities were the marketing of products of patrons. It referred to "the well established business practice" of the pool. Respondent's check-off, service charges and gains from paraffining and hauling products, the court found, were retained to meet the corporate operating expenses and any surplus was to be returned to the patrons in the form of dividends.

Respondent actually engaged in many activities. It employed in its principal office twelve persons; in its warehouse, six, and for trucking, four. It acquired the assets of another co-operative and assumed its liabilities, reciting in its resolution that it was more convenient and economical to operate "the business" of the selling corporation and that of itself as one unit. Respondent acted as a marketing agent for its patrons, entering into contracts with them, which gave it broad powers to process, manufacture and sell milk products, to adopt agencies or facilities therefor, to incur expenses deemed necessary, to borrow money and to pledge assets. The contracts provided for liquidated damages of thirty per cent of the value of such products as the seller should fail to deliver, which in turn became income distributable, after payment of expenses, to persons entitled thereto.

About December 1, 1939, it modified somewhat its arrangement with its patrons. Thereafter it received through its local co-operatives cheese which the latter had made from milk delivered by farmers. This product it weighed and "paraffined" and then sold on the open market at a premium of from ¾ cent to 1 cent over the "Plymouth market." From the purchase price received, it paid to the local co-operatives ⅛ cent to ¼ cent per pound above the same market price. Out of these receipts the locals paid their own operating costs, distributing the balance to patrons. Whether these transactions can be said properly to constitute actual purchases and sales or whether they include merely the legitimate activities of a marketing agent we deem it unnecessary to decide. We observe, however, that in its

receipts issued for cheese, respondent itself employed the term "bought."

Respondent bought in the open market equipment and supplies, which it resold to the locals, frequently by conditional sale contracts, at a price of from 10 to 25 per cent above cost. Among such supplies were butter, salt, rennet, cheese coloring, pans, sulphuric acid, washing powder, cheese bandages and boxes and miscellaneous equipment.

When cheese was brought to the warehouse it was paraffined by respondent. Paraffine cost approximately 5 cents per pound and when attached to the cheese it was included in the weight and sold for from 13 cents to 15 cents a pound, the gross income from this source in 1940 being $6,755.74.

Respondent operated trucks used in gathering cheese from the locals. It owned the real estate of four different local co-operatives, furnishing the funds necessary for their acquisition. Respondent mortgaged the property of three of the local co-operatives to the First Wisconsin National Bank of Milwaukee, from which it borrowed $145,000. It gave to this bank a chattel mortgage upon equipment owned by it located at various locals.

At one time respondent retained in its warehouse a large amount of cheese in the hope that the price would increase. In this transaction it incurred a loss of some $16,000. It maintained balance sheets and profit and loss statements in the forms ordinarily used by moneyed corporations, from which it appears that the sales ran as high as $3,817,000 annually and that, after deducting costs and expenses of operation, in some years there was a small profit and in others a loss.

From the Wisconsin statute and the corporate powers and activities of respondent, it seems clear that it is such a corporation as, under the definition prescribed by the Congress, may be adjudicated bankrupt. Congress has not seen fit to exempt co-operative associations. It has provided that a moneyed, commercial or business corporation may become bankrupt. It has not distinguished between corporations which distribute profits to their stockholders and those which distribute to their patrons. There is nothing in the nature of a co-operative association which conducts business for the purpose of realizing profit for those with whom it does business to remove it from the Congressional definition. While

1002

such associations are to be encouraged as instrumentalities looking to aid of their patrons, they are not eleemosynary or charitable organizations. Rather they represent merely a banding together of producers for their common financial advancement. The sole motive is pecuniary gain. Where the chief purpose is, as it is here, to carry on trade or commerce in an established field and to do this primarily for the financial benefit of those who have joined in its organization and in the conduct of its affairs, there seems to us no room for doubt that the corporation is a business or commercial corporation within the intendment of the Bankruptcy Act. Schuster v. Ohio Farmers' Co-op. Milk Ass'n, 6 Cir., 61 F.2d 337; Roumanian Workers Educational Ass'n of America v. Popovich, 6 Cir., 108 F.2d 782; In re South Shore Co-op. Ass'n, D.C., 4 F.Supp. 772.

■ Schuster v. Ohio Farmers' Co-op. Milk Ass'n, 6 Cir., 61 F.2d 337, was decided prior to the recent amendment of the Bankruptcy Act. The court there commented upon the failure of Congress to exclude co-operatives from the operation of the act. With this decision before it, Congress did not see fit to reframe its definition so as to exclude co-operatives. It must be presumed that the legislative body approved the judicial construction given its prior legislation of substantially the same purport.

■ It is said that it is the public policy both in the state and nation to promote and nurture the development of co-operatives and that to hold them subject to bankruptcy is to interfere with such public policy. The reasoning is fallacious. To hold a corporation amenable to bankruptcy is not in any wise to interfere with its activities as a useful association or to penalize it. The Bankruptcy Act is remedial legislation. Its excuse for existence lies in the underlying theory that in the absence of bankruptcy the diligent creditor may lay hold of all assets to the detriment of others. For the old legal maxim that, to the diligent belongs the reward, it has supplied a new one,—equality is equity. Its purpose is to see that the assets of an insolvent may be divided ratably amongst its creditors and to make it impossible for one or more favored creditors to seize everything in sight. Respondent has invoked the laws of Wisconsin for liquidation, in the form of an assignment for the benefit of creditors. There is no reason in existing public policy why the administration and distribution of its assets should not be had in a court of equity where preferences are abhorred rather than in a state insolvency proceedings, where their validity is recognized. This is not penalization of a co-operative. It is merely application of the remedial, equitable purposes of bankruptcy legislation in liquidation.

■ It is likewise urged that the statutes of Wisconsin indicate that the liquidation of such a corporation is to be left to the state courts and that it was the purpose of Congress to allow the state policy to persist. The argument falls when we remember that paramount bankruptcy power is, under the Constitution, lodged in the Congress; that its enactment is nation-wide in effect and supersedes any state statute interfering therewith.

The power to determine whether one may be bankrupt and what relief may be granted to him and to his creditors lies with Congress, and any state legislation interfering with the same must give way before that paramount authority. The state can not determine who shall be admitted to bankruptcy; that is the function of Congress. We can only inquire whether a corporation, whose powers are defined by the state statute, comes within the Congressional definition of those who may be declared bankrupts. Thus far and thus far only may we have reference to the Wisconsin statutes and to the articles of incorporation. State laws create legal interests. Federal legislation, in pursuance of the Constitution, determines whether an interest or right created by local law is within the federal law. The latter must prevail no matter what name is given the interest or right by the local law. Morgan v. Commissioner, 309 U.S. 78 and 81, 60 S.Ct. 424, 84 L.Ed. 585. Our examination of the record convinces us that this corporation, under the Wisconsin statutes, possessed the powers of a business, commercial and moneyed corporation and that, therefore, it is within the Congressional definition of those whose estates may be administered in bankruptcy.

The judgment is reversed, with directions to proceed in accord with the announcements of this opinion.