PIG PRO NONSTOCK COOPERATIVE, A NEBRASKA NONSTOCK COOPERATIVE CORPORATION, APPELLEE, V. SCOTT MOORE, SECRETARY OF STATE OF NEBRASKA, AND DONALD B. STENBERG, ATTORNEY GENERAL OF NEBRASKA, APPELLANTS.

568 N.W.2d 217

Filed August 29, 1997.   No. S-95-1163.

Donald Stenberg, Attorney General, and L. Jay Bartel for appellants.

Theodore L. Kessner and D. Bryan Wickens, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellee.

Robert V. Broom, of Broom, Johnson & Clarkson, and Allen H. Olson, of University of Arkansas School of Law, for amici curiae David L. Hansen, Everett Holstein, and Friends of the Constitution.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

The Nebraska Constitution restricts corporate ownership of farm and ranch land but excepts "non-profit corporations" from those restrictions. The issue of first impression before us in this case is whether a corporation formed pursuant to Nebraska's Nonstock Cooperative Marketing Act, Neb. Rev. Stat. § 21-1401 et seq. (Reissue 1991 & Cum. Supp. 1996), falls within this exception. Based upon our independent review of this issue of law, we conclude that a nonstock cooperative corporation is not a "non-profit corporation" as that term is used in article XII, § 8(1)(B), of the Nebraska Constitution, because it exists and operates for the economic benefit of its members. We, therefore, reverse the judgment of the district court for Lancaster County and remand the cause with directions.

## BACKGROUND

Plaintiff-appellee, Pig Pro Nonstock Cooperative (Cooperative), is a corporation organized pursuant to the Nonstock Cooperative Marketing Act. On August 22, 1994, the Cooperative filed a petition for declaratory judgment in the district court for Lancaster County in which it sought a judgment

> declaring that it is a nonprofit corporation as identified in Article XII, Section 8 of the Constitution of Nebraska and as such that the Cooperative can acquire the agricultural land, facilities and livestock needed for its swine farrowing and nursery activities to provide feeder pigs to its members on a cost-of-production basis . . . .

The original defendants were Allen J. Beermann, then the Secretary of State of Nebraska, and Donald B. Stenberg, Attorney General of Nebraska, both of whom were sued in their official capacities. Beermann and Stenberg filed an answer alleging that "the Cooperative is not a 'Non-profit corporation' exempt from the restrictions on non-family corporate farming or ranching as defined in Article XII, § 8, of the Nebraska Constitution." Scott Moore, the incumbent Secretary of State, was later substituted for defendant Beermann. The parties then filed a written stipulation of facts, which we now summarize.

In July 1994, the Cooperative filed articles of incorporation signed by five individual incorporators. These individuals

formed the Cooperative "so that together they [could] acquire feeder pigs, feed, and related products and services on a collective, cooperative, and cost-of-production basis." The articles include a provision that the Cooperative will have all powers and rights conferred by the Nonstock Cooperative Marketing Act.

The articles of incorporation limit membership in the Cooperative to "persons actively engaged in the feeding of hogs for slaughter." Each member has one vote in the conduct of the affairs of the Cooperative. Initially, the five incorporators are the only members. The availability of additional memberships is limited by the number of pigs produced by the Cooperative.

Each member of the Cooperative holds base capital credits in the initial amount of $15,000, which constitute a "permanent investment" in the Cooperative. The amount of base capital credits is to be adjusted annually by unanimous vote of the members based upon the "patronage" of each member. Under its bylaws, the Cooperative must redeem the members' base capital credits for cash on a pro rata basis when funds are available. The Cooperative has a lien upon a member's base capital credits for any amounts which the member owes to the Cooperative, and the board of directors may "offset amounts owed the Cooperative from the Base Capital Credits of a defaulting member."

The bylaws provide that the board of directors, consisting of five members of the Cooperative, "shall have the general supervision and control of the business and the affairs" of the Cooperative. The bylaws authorize the board of directors to appoint a manager to be "the administrator of the Cooperative's activities" with responsibility for daily operations and the maintenance of financial records.

As required by § 21-1403, the articles and bylaws of the Cooperative contain a statement of the method to be followed in distributing earnings or savings. These documents provide that the Cooperative "shall conduct its activities on a nonprofit basis" and that "all savings from its activities shall belong to its members as producers of hogs for slaughter." On an annual basis, the Cooperative shall determine the amount of its "gross receipts," which shall include "income from all sources and

activities of the Cooperative." From this amount, the Cooperative must deduct "all costs and expenses and other charges which are appropriately excludable or deductible" as well as the amount of "reasonable reserves for depreciation, obsolescence and contingencies, and any other necessary purpose." The resulting "net margins" of the Cooperative shall "belong to and be held for the members and shall be apportioned among them [on a patronage basis] at the close of each fiscal year." This distribution, characterized as a "patronage refund," is to be calculated "on the basis of and in proportion to the amount of the Cooperative's revenue produced by each member." It may be made in the form of cash, base capital credits, or both.

The members will pay the Cooperative the base price established by the Cooperative based upon its estimated cost of production of the feeder pigs. Annually, the Cooperative will determine its actual cost of production of the feeder pigs delivered to its members. If the actual cost is less than the base price, the difference will be apportioned among the members on a pro rata basis. If the actual cost exceeds the base price, the deficit will be assessed against the members on the basis of feeder pigs received. Each member will also contract to purchase from the Cooperative all feed and animal health supplies necessary to finish the feeder pigs obtained from the Cooperative, other than grain produced by the member.

The Cooperative plans to acquire and operate, for the exclusive benefit of its members, an existing swine farrowing and nursery facility, together with related equipment, situated on land near Farnam in Dawson County, Nebraska. The Cooperative has an option to purchase the land and facilities for $115,000 and expects that "an additional $25,000.00 will be required for immediate capital improvements." The facility has sufficient capacity for a 270-head sow herd, and the Cooperative anticipates the cost of the sow herd and boars to be approximately $75,000. The Cooperative estimates that the maximum working capital requirement for operation of the facility will be $140,000.

Once operational, the Cooperative expects to produce approximately 5,350 feeder pigs each year, which it will supply

only to its members. Each member will enter into a Feeder Pig Supply Contract with the Cooperative. The contract will obligate the member to purchase a "feeder pig quota" from the Cooperative on a rotating delivery schedule.

The Cooperative may terminate a feeder pig supply contract for the failure of a member to pay for and take delivery of any two successive lots of feeder pigs supplied by the Cooperative, or for breach of the requirement that the member purchase all necessary feed and animal health supplies from the Cooperative. In the event that a member breaches the feeder pig supply contract, the Cooperative retains all legal and equitable remedies "including the right to set off any damages sustained by the Cooperative against the Base Capital Credits of the Member in the Cooperative."

The Cooperative has applied for and expects to be granted exempt status under I.R.C. § 521(a) (1994) as a farmer-owned cooperative providing products solely to its members on a patronage basis.

To enable the Cooperative to purchase the land and existing swine farrowing and nursery facilities in Dawson County, it sought a loan from CoBank/National Bank for Cooperatives. CoBank conditioned any further discussions concerning the lending of funds to the Cooperative on a determination that the intended operations of the Cooperative do not violate the provisions of article XII, § 8, of the Constitution of Nebraska.

The stipulation of the parties included an affidavit executed by Neil Oxton, who served as president of Farmers Union of Nebraska from 1978 through 1985. The Cooperative waived "foundation" for the affidavit, but objected to the court's consideration of its content "for the reason that such declarations are not relevant to the determination of the matters at issue since the 'intent' of the promoters of Initiative 300, resulting in Article XII, Section 8 of the Nebraska Constitution, are irrelevant and immaterial."

In an order entered on September 18, 1995, the district court held that the phrase "non-profit corporation" as used in article XII, § 8, of the Nebraska Constitution was unclear and therefore open to judicial construction. The district court rejected the Oxton affidavit statements regarding the "intent" of Initiative

300 promoters as irrelevant. Noting that nonstock cooperatives were deemed by § 21-1401 as "non-profit, inasmuch as they are not organized to make profits for themselves as such or for their members as such but only for their members as producers," the district court found:

> As stipulated by the facts, the Cooperative does conduct its activities on a not-for-profit basis pursuant to the method set forth in the Cooperative's Plan of Operation. Agricultural cooperations [sic] are unique entities, formed to provide producers with needed commodities at production costs. While this type of organization strengthens the economic position of its members indirectly, it does not achieve such a purpose as a separate entity by providing income or returns to its members as would a traditional profit-making corporation. Instead, it appears more similar to the family farm or ranch corporation because it maintains the relationship between agricultural land ownership and family in that most members of cooperatives are individual owners of family farms or ranches.

The district court concluded that the Cooperative "is a nonprofit corporation and the provisions of Article XII, Section 8 of the Nebraska Constitution are not applicable to it" and entered judgment for the Cooperative. Moore and Stenberg appeal from that judgment.

### ASSIGNMENTS OF ERROR

Moore and Stenberg contend that the district court erred in (1) finding that the Cooperative's status as a nonstock cooperative corporation organized under §§ 21-1401 through 21-1404 qualified it as a nonprofit corporation exempt from the restrictions in article XII, § 8, of the Nebraska Constitution; (2) failing to find that the history of the enactment of article XII, § 8, demonstrated that cooperative corporations were not intended to be considered nonprofit corporations exempt from article XII, § 8; and (3) failing to find that under the common and ordinary meaning of the term "nonprofit corporation," cooperative corporations are not nonprofit corporations within the intent and meaning of article XII, § 8.

## STANDARD OF REVIEW

The construction and interpretation of the Constitution is a judicial function. *Calabro v. City of Omaha*, 247 Neb. 955, 531 N.W.2d 541 (1995); *Jaksha v. State*, 241 Neb. 106, 486 N.W.2d 858 (1992). Interpretation of a statute presents a question of law. *County of Seward v. Andelt*, 251 Neb. 713, 559 N.W.2d 465 (1997); *Van Ackeren v. Nebraska Bd. of Parole*, 251 Neb. 477, 558 N.W.2d 48 (1997).

When a declaratory judgment action presents a question of law, an appellate court has an obligation to reach its conclusion independent from the conclusion reached by the trial court with regard to that question. *Burke v. Blue Cross Blue Shield*, 251 Neb. 607, 558 N.W.2d 577 (1997); *Hauserman v. Stadler*, 251 Neb. 106, 554 N.W.2d 798 (1996); *Farm Bureau Ins. Co. v. Bierschenk*, 250 Neb. 146, 548 N.W.2d 322 (1996).

## ANALYSIS

A constitution represents the supreme written will of the people regarding the framework for their government. *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996); *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994). The Constitution of Nebraska specifically recognizes the right of the people to amend their Constitution, independent of any action by the Legislature, by passing a ballot initiative. Neb. Const. art. III, §§ 1 and 2. In a case involving such a constitutional amendment, it is not the province of this court to judge the wisdom or the desirability of the amendment. *Duggan v. Beermann*, 249 Neb. 411, 544 N.W.2d 68 (1996); *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 389 N.W.2d 269 (1986).

The amendment to the Nebraska Constitution now codified as article XII, § 8, was adopted as the result of the voters' passage of Initiative 300 on November 2, 1982. The text of Neb. Const. art. XII, insofar as pertinent to the issues in this case, states:

Sec. 8(1) No corporation or syndicate shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching.

Corporation shall mean any corporation organized under the laws of any state of the United States or any

country or any partnership of which such corporation is a partner.

Farming or ranching shall mean (i) the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or (ii) the ownership, keeping or feeding of animals for the production of livestock or livestock products.

Syndicate shall mean any limited partnership organized under the laws of any state of the United States or any country, other than limited partnerships in which the partners are members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch, and none of whom are nonresident aliens. This shall not include general partnerships.

These restrictions shall not apply to:

(A) A family farm or ranch corporation. Family farm or ranch corporation shall mean a corporation engaged in farming or ranching or the ownership of agricultural land, in which the majority of the voting stock is held by members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch and none of whose stockholders are non-resident aliens and none of whose stockholders are corporations or partnerships, unless all of the stockholders or partners of such entities are persons related within the fourth degree of kindred to the majority of stockholders in the family farm corporation.

These restrictions shall not apply to:

(B) Non-profit corporations.

These restrictions shall not apply to:

(C) Nebraska Indian tribal corporations.

There are several other exceptions to the constitutional prohibition of corporate ownership of farm and ranch land which are not applicable to this case. See Neb. Const. art. XII, § 8(1)(D) through (N). The Secretary of State is given responsibility for monitoring compliance with this constitutional provision and must report possible violations to the Attorney General, who may initiate judicial enforcement proceedings. Neb. Const. art. XII, § 8.

In *Omaha Nat. Bank v. Spire, supra*, this court held that the passage of Initiative 300 was a valid exercise of the right of Nebraska citizens to amend their Constitution through the initiative process and that the amendment did not conflict with the federal Constitution. See, also, *MSM Farms, Inc. v. Spire*, 927 F.2d 330, 335 (8th Cir. 1991) (holding article XII, § 8, of Nebraska Constitution represents "a reasonable judgment [by the people of Nebraska] that prohibiting non-family corporate farming serves the public interest in preserving agriculture where families own and farm the land" and the provision not in conflict with federal Constitution), *cert. denied* 502 U.S. 814, 112 S. Ct. 65, 116 L. Ed. 2d 40.

Initially, we must determine whether the constitutional provisions at issue in this case are subject to judicial construction. Constitutional provisions, like statutes, are not open to construction as a matter of course; construction is appropriate only when it has been demonstrated that the meaning of the provision is not clear and therefore that construction is necessary. *State ex rel. Stenberg v. Douglas Racing Corp.*, 246 Neb. 901, 524 N.W.2d 61 (1994); *State ex rel. Spire v. Beermann*, 235 Neb. 384, 455 N.W.2d 749 (1990); *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987). Because the term "non-profit corporation" is not specifically defined in article XII, § 8, of the Nebraska Constitution, we agree with the finding of the district court that its meaning is unclear and therefore requires judicial construction.

We also agree with the district court that the affidavit of Oxton cannot be utilized as an aid to construction of the constitutional language at issue in this case. The affidavit recites the involvement of Oxton and others in the drafting of Initiative 300

and the circulation of petitions. It also includes the opinions and beliefs of Oxton and other supporters of the initiative regarding its general scope and the specific issue of whether cooperatives should be subject to the constitutional prohibition on corporate ownership of farmland. In *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 389 N.W.2d 269 (1986), we held that while the framers' intent was relevant in construing a constitutional provision which originated in a constitutional convention, a different rule applied to an initiative enactment. We stated:

> There is no meaningful way to determine the intent which motivates voters to sign a petition for the submission of an enactment, nor is there any real way to determine the intent of those voters who vote for the adoption of an enactment. The motivations and mental processes of the voter in Verdigre or the elector in Elkhorn cannot be determined—except from the words of the enactment itself. . . . We hold that the intent of the voters adopting an initiative amendment to the Nebraska Constitution must be determined from the words of the initiative amendment itself.

223 Neb. at 224-25, 389 N.W.2d at 279. We reaffirmed this rule in *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. at 183, 410 N.W.2d at 467, stating:

> [T]his jurisdiction is committed to the rule that the intent of the voters in adopting an initiative amendment to the Nebraska Constitution must be determined by the words of the initiative amendment itself, because there is no meaningful way to determine the motivations for submitting the initiative to the electorate or to determine the intent of those voting for its enactment.

Given this authority, the district court correctly precluded consideration of the Oxton affidavit on the issue of the intent of the constitutional amendment.

Moore and Stenberg contend that the affidavit contains "historical or operative facts" regarding the enactment of Initiative 300 which may be considered in interpreting the constitutional language at issue. In *Omaha Nat. Bank v. Spire, supra*, we recognized that such facts may be used by a court in construing constitutional language. See, also, *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949)

(holding it permissible to consider facts of history in determining meaning of language of Constitution). However, we find that the Oxton affidavit is so permeated with statements of personal belief and intent that pure "historical facts" cannot be drawn from its text. Additionally, other than the undisputed passage of Initiative 300 by the voters in 1982, we find the only pertinent historical facts to be the following:

> The ballot submitted to the electorate afforded the voters the opportunity to vote "For" or "Against" in response to the question, "Shall a constitutional prohibition be created prohibiting ownership of Nebraska farm or ranch land by any corporation, domestic or foreign, which is not a Nebraska family farm corporation . . . ?" The ballot also stated:

> "A vote FOR will create a constitutional prohibition against further purchase of Nebraska farm and ranch lands by any corporation or syndicate other than a Nebraska family farm corporation.

> "A vote AGAINST will reject such a constitutional restriction on ownership of Nebraska farm and ranch land."

*Omaha Nat. Bank v. Spire*, 223 Neb. at 214-15, 389 N.W.2d at 273.

In ascertaining the intent of a constitutional provision from its language, the words must be

> "interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests that they are used in a technical sense. The court may not supply any supposed omission, or add words to or take words from the provision as framed. It must be construed as a whole, and no part will be rejected as meaningless or surplusage, if it can be avoided. If the meaning is clear, the court will give to it the meaning that obviously would be accepted and understood by the layman. . . . It is permissible to consider the facts of history in determining the meaning of the language of the Constitution. . . . It is also appropriate and helpful to consider, in connection with the historical background, the evil and mischief attempted to be remedied, the objects sought to be accomplished, and the scope of the remedy its terms imply."

*State ex rel. Spire v. Beermann*, 235 Neb. 384, 390, 455 N.W.2d 749, 752 (1990), quoting *State ex rel. State Railway Commission v. Ramsey, supra.* See, also, *State ex rel. Douglas v. Beermann*, 216 Neb. 849, 347 N.W.2d 297 (1984); *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972).

Applying these standards of construction to the language of article XII, § 8, of the Constitution of Nebraska, we reaffirm the conclusion we reached in *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 225-26, 389 N.W.2d 269, 279-80 (1986):

> The voters have placed in their Constitution words which forbid a corporation to obtain, in any way, any kind of interest ("legal, beneficial, or otherwise") in certain real estate. It is clear that any interest obtained by a corporation must be *something*. Initiative 300 forbids corporations to obtain any interest in the described sort of real estate . . . .

We determine that the language of article XII, § 8, read as a whole, reflects an intent to prohibit individuals who are not members of the same family or Nebraska Indian tribe from forming and utilizing a corporation to own and operate farm or ranch land for their personal economic gain, other than for the specific excepted uses set forth in § 8(1)(E) through (N).

The meaning of the term "non-profit corporation" as used in article XII, § 8(1)(B), must be construed in the context of this general intent. The language of a constitutional provision is to be interpreted with reference to established laws, usage, and customs of the country at the time of its adoption, but its terms and provisions are constantly expanded and enlarged by construction to meet the advancing affairs of humankind. *State ex rel. Spire v. Conway*, 238 Neb. 766, 472 N.W.2d 403 (1991). A nonprofit corporation is commonly defined as "[a] corporation no part of the income of which is distributable to its members, directors or officers." Black's Law Dictionary 1056 (6th ed. 1990). This same language is used in the Nebraska Nonprofit Corporation Act to define a "not-for-profit corporation." See Neb. Rev. Stat. § 21-1901(3) (Reissue 1991). In determining whether a corporation is "nonprofit," courts typically focus on the issue of whether it is organized and operated for the economic gain of its incorporators or members. *People ex rel*

*Meiresonne v. Arnold*, 37 Colo. App. 414, 553 P.2d 79 (1976); *State v. North Star Research & Develop. Inst.*, 294 Minn. 56, 200 N.W.2d 410 (1972). See, also, *Bethphage Com. Servs. v. County Board*, 221 Neb. 886, 381 N.W.2d 166 (1986) (holding in context of property tax exemption statute, corporation formed to provide group homes to developmentally disabled persons that did not distribute any of its income to its members, directors, officers, or private individuals nor use its property for financial gain or profit was nonprofit).

The term "profit" can be defined as "[p]ecuniary gain resulting from the employment of capital in any transaction." Webster's Encyclopedic Unabridged Dictionary of the English Language 1149 (1994). In determining whether an entity is a "nonprofit corporation," the term "profit" has been construed in this broad sense to include various forms of economic benefit. For example, in *State ex rel. Troy v. Lumbermen's Clinic*, 186 Wash. 384, 58 P.2d 812 (1936), a medical clinic organized by a group of employers to furnish medical aid at a lower cost than other providers was held to result in a "profit" to the members of the corporation who contracted with a clinic to provide medical services to their employees. The court noted: "Profit does not necessarily mean a direct return by way of dividends, interest, capital account or salaries. A saving of expense which would otherwise necessarily be incurred is also a profit to the person benefited." 186 Wash. at 394, 58 P.2d at 816.

Based upon the overall intent derived from the language of article XII, § 8, of the Nebraska Constitution and the accepted statutory and common-law definitions of the term "nonprofit corporation," we conclude that as used in article XII, § 8(1)(B), of the Nebraska Constitution, the term "non-profit corporation" means a corporate entity which does not distribute or otherwise confer any form of economic benefit upon its members, directors, or officers.

In determining whether the Cooperative is a "non-profit corporation" under this definition, we must first look at the statute under which it was formed. The Nebraska Nonstock Cooperative Marketing Act, § 21-1401 et seq., was enacted by the Legislature in 1925. Section 21-1401(1) defines terms used in the Act, providing that unless the context otherwise requires,

(a) [t]he term association means any corporation formed hereunder; (b) the term member means a person who owns a certificate of membership in an association formed without capital stock; (c) the term person means an individual, a partnership, a limited liability company, a corporation, an association, or two or more persons having a joint or common interest; (d) the term agricultural products or products means field crops, horticultural, viticultural, forestry, nut, dairy, livestock, poultry, bee and farm products, and the byproducts derived from any of them . . . .

Section 21-1401(2) provides: "Associations organized hereunder shall be deemed nonprofit, inasmuch as they are not organized to make profits for themselves as such or for their members as such but only for their members as producers."

A nonstock cooperative association may be formed by "[a]ny number of persons, not less than five, engaged in the production of agricultural products or two or more nonprofit cooperative companies, stock or nonstock . . . for the transaction of any lawful business . . . ." § 21-1402. Membership in the nonstock cooperative is limited to "persons engaged in the production of the agricultural products, including lessees and landlords receiving such products as rent . . . or cooperative associations of such producers . . . ." § 21-1406. Only members have voting rights, and each member is entitled to one vote. *Id.* A member is not liable for the debts or obligations of a nonstock cooperative "beyond the unpaid amount, if any, due by him or her on his or her membership dues." *Id.* Within a reasonable time after the death, withdrawal, or expulsion of a member, the cooperative's board of directors is required to "equitably and conclusively ascertain the value of such member's membership, if any, which shall be paid him or her or his or her legal representatives by the association within a reasonable time after such ascertainment." *Id.*

The articles of incorporation of a nonstock cooperative "shall be filed in accordance with the general corporation laws" of Nebraska, and the fees for incorporation "shall be the same as those required by law of other nonprofit corporations." § 21-1404.

A nonstock cooperative is specifically authorized by statute to enter into contracts with its members

> requiring them to sell or market all or a specified part of their livestock or other products to or through the association, or to buy all, or a specified part, of their farm supplies from or through the association [and] to act as agent or representative of any member or members or of nonmembers in carrying out the objects of the association . . . .

§ 21-1405. The cooperative may "set aside each year to a surplus fund a portion of the savings of the company which surplus may be used for conducting the business of the corporation . . . ." *Id.*

Section 21-1407 provides that a nonstock cooperative "shall make such provision as it may desire for the adoption of its board of directors of a code of bylaws for the government and management of its business consistent herewith." The board of directors of the cooperative must meet at least once a year and shall have the right to call a special meeting at any time. Notice of all meetings must be given to members of the cooperative. § 21-1408. Nonstock cooperative associations may become members of other cooperatives, and "[a]ny two or more [nonstock cooperative] associations may, by agreement between them, unite in employing and using or may separately employ and use the same methods, means, and agencies for carrying on and conducting their respective business." § 21-1411. Finally, the Nonstock Cooperative Marketing Act provides:

> The provisions of the general corporation laws of this state, and all powers and rights thereunder, shall apply to the associations organized hereunder, except where such provisions are in conflict with or inconsistent with the express provisions of sections 21-1401 to 21-1414; *Provided,* that wherever such general corporation laws require an affirmative vote of a specified percentage of stockholders to authorize action by the corporation, such percentage for a nonstock cooperative association shall be that percentage of the votes cast on the matter at the members' meeting at which the same shall be voted upon. Any provision of law which is in conflict therewith shall not be construed as applying to any association herein provided for.

§ 21-1414.

Read together, these statutory provisions describe a corporate entity having essential purposes and functions which are more commercial than eleemosynary in nature. The Cooperative contends, however, that its status as a "nonprofit corporation" is conclusively determined by the language of § 21-1401(2), which states that nonstock cooperatives "shall be deemed nonprofit, inasmuch as they are not organized to make profits for themselves as such or for their members as such but only for their members as producers." Other courts construing similar statutory language have looked beyond the statutory language to the actual nature and purpose of the cooperative in determining whether it was in fact "nonprofit" in a specific context. In *Diekmann v. Evansville Producers Com. Assn.*, 219 Ind. 636, 40 N.E.2d 327 (1942), a cooperative association formed under Kentucky law relied upon statutory language nearly identical to § 21-1401(2) in contending that it was entitled to an Indiana tax exemption for " 'companies, organizations, corporations and/or societies . . . which are not organized for profit, and no part of the income of which inures to the benefit of any stockholder or other private individual.' " *Id.* at 637, 40 N.E.2d at 327. Rejecting this argument, the Supreme Court of Indiana stated:

> Instead of supporting appellee's contention we think [the "nonprofit" clause in the Kentucky Act under which the association was organized] indicates that the purpose of the organization is to make profit, not indeed for the corporation, but for persons shipping their products to the corporation. It is disclosed by the operating statement that in fact appellee does make a profit for those persons which accrues and is distributable in the form of "patronage dividends" . . . .

219 Ind. at 640, 40 N.E.2d at 329.

Similar rationale was applied by the court in *Schuster v. Ohio Farmers' Co-op. Milk Ass'n*, 61 F.2d 337 (6th Cir. 1932), in holding that an agricultural cooperative was a "business and commercial" corporation within the meaning of the federal Bankruptcy Act then in effect, notwithstanding language in the Ohio Co-operative Marketing Act similar to § 21-1401(2), by which the cooperative was " 'deemed "nonprofit." ' " 61 F.2d at 337. The Sixth Circuit stated:

Obviously, the co-operative marketing association is orga-
nized for profit in the sense of financial benefit to its mem-
bers. The element of departure from ordinary corporate
economic practice is found in the fact that the financial
gain is enjoyed by the members in proportion to the pro-
duction, by each, of the products handled, rather than in
proportion to the capital otherwise contributed by each to
the conduct of the business; but this difference of eco-
nomic principle governing the distribution of wealth can-
not alter the fact that the sole incentive to membership in
such an association is the financial benefit to be derived
therefrom in the marketing of the farm products which the
member is producing. There is nothing broadly eleemosy-
nary in co-operative associations. They simply represent a
banding together of producers for their common good, and
the motive of each is pecuniary gain.

61 F.2d. at 338. The Sixth Circuit further noted that the chief
purpose of the cooperative was to "carry on trade or commerce
in an established field" for the financial benefit of its members.
*Id.* See, also, *Missco Homestead Ass'n v. United States*, 185
F.2d 280 (8th Cir. 1950); *In re Wisconsin Co-operative Milk
Pool*, 119 F.2d 999 (7th Cir. 1941), *cert. denied* 314 U.S. 655,
62 S. Ct. 105, 86 L. Ed. 525.

We disagree with the finding of the district court that
§ 21-1401(2) is an "absolute and unqualified" designation of a
nonstock cooperative as a " 'non-profit corporation.' " Rather,
we interpret it as a statement that while the Cooperative itself
does not retain profits, it is nonetheless operated for the purpose
of generating economic gain for the producers who compose its
membership. This is evident not only from the statutory lan-
guage but also from the evidence in the record.

The plan of operation of the Cooperative clearly contem-
plates a business enterprise in which the Cooperative "will
acquire and operate for the exclusive benefit of the Members a
sow-feeder pig production facility near Farnam, Nebraska . . . ."
All "savings" from its operations inure to the exclusive benefit
to its members, who have a "permanent investment" in the
cooperative, not to agriculture in general. Members will have a
permanent investment in the enterprise represented by their ini-

tial and subsequently acquired base capital credits. Under the provisions of the articles and bylaws quoted above, and as required by the Nonstock Cooperative Marketing Act, members will be eligible to receive annual "patronage refunds" representing each member's share of any amount by which the Cooperative's annual gross receipts exceed expenses and required reserves.

Under the Internal Revenue Code, such patronage refunds are excluded from the gross income of the Cooperative if the member consents to include them in his or her gross income. I.R.C. §§ 1382, 1385(a), and 1388(c) (1994). In this case, the Cooperative has specifically provided in its bylaws:

> Each member who applies for and is accepted as a member of the Cooperative, by such act alone, consents that the amount of any distribution with respect to his/her patronage, and which is made in written notices of allocation (as defined in 26 USC 1388), and which is received by him/her from the Cooperative, will be taken into account by him/her at the stated dollar amount, in the manner provided in 26 USC 1385(a), in the taxable year in which such written notice of allocation is received by him/her.

In contrast, a typical nonprofit corporation would be exempt from federal income taxation under I.R.C. § 501(c) (1994), and its members would receive no economic benefits from the corporation for which they would be subject to tax.

We also disagree with the district court's finding that a cooperative "appears more similar to the family farm or ranch corporation because it maintains the relationship between agricultural land ownership and family in that most members of cooperatives are individual owners of family farms or ranches." Although members of a nonstock cooperative must be "persons engaged in the production of the agricultural products," § 21-1406, there is no requirement of a familial relationship; in fact, corporations and other cooperatives are eligible for membership in a nonstock cooperative, §§ 21-1401 and 21-1406. Likewise, there is no requirement that any member of the Cooperative reside on its premises or personally conduct its operations. Under its bylaws, the Cooperative's board of directors may appoint a manager to "have general charge of the ordi-

nary and usual activities of the Cooperative." It is precisely this type of absentee ownership and operation of farm and ranch land by a corporate entity which the plain language of article XII, § 8, prohibits.

The fact that members of the Cooperative are themselves agricultural producers who would derive economic benefit from the Cooperative in the form of "savings" and "patronage refunds," as opposed to "dividends" or "profits," does not further the argument that the Cooperative is a nonprofit corporation exempt from the constitutional restrictions on corporate farming. In our view, the critical factor is not the manner in which the Cooperative would distribute economic benefits, or the occupations of the persons to whom such distribution would be made, but, rather, the inescapable fact that some form of economic benefit is intended to pass from the Cooperative to its members as a direct result of its proposed livestock production activities on Nebraska land. Our Constitution would clearly prohibit a business corporation whose shareholders were five unrelated farmers from owning and operating a swine farrowing facility on Nebraska land under the daily supervision of a manager hired by the corporation. We see no reasonable basis on which the term "non-profit corporation" as used in article XII, § 8(1)(B), could be construed to permit those same five individuals to form a nonstock cooperative corporation to own and operate such a facility for their economic benefit. Such a construction would clearly violate the intent of article XII, § 8, of the Nebraska Constitution, as derived from its language read as a whole.

## CONCLUSION

For the reasons discussed, we hold that as an entity formed pursuant to the Nonstock Cooperative Marketing Act, Pig Pro Nonstock Cooperative is not a "non-profit corporation" within the meaning of article XII, § 8(1)(B), of the Nebraska Constitution, and it is, therefore, subject to the constitutional restriction on ownership of Nebraska real estate used in farming or ranching. We, therefore, reverse the judgment of the district court and remand the cause for entry of judgment in the district court in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.