NORMA L. HALL ET AL., APPELLANTS,
v. PROGRESS PIG, INC., APPELLEE.
575 N.W.2d 369

Filed March 6, 1998.    No. S-96-857.

Robert V. Broom, of Broom, Johnson & Clarkson, for appellants.

Leo A. Knowles, of McGrath, North, Mullin & Kratz, P.C., for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MCCORMACK, JJ.

PER CURIAM.
The plaintiffs-appellants private citizens, Norma L. Hall, David L. Hansen, Everett Holstein, and John K. Hansen, challenge the district court's dismissal of this action, which seeks to enjoin the operations of the defendant-appellee corporation, Progress Pig, Inc., as violative of the corporate farming limitations imposed by Neb. Const. art. XII, § 8. In appealing to the Nebraska Court of Appeals, the plaintiffs asserted that the district court erred in a variety of procedural and substantive rulings, including by determining that the plaintiffs lack standing to bring suit and failing to rule in the plaintiffs' favor on the merits. Under our authority to regulate the caseloads of the Court of Appeals and this court, we removed the matter to our docket. Because the plaintiffs have standing, we reverse, and remand for further proceedings.

## SCOPE OF REVIEW
Injunction is a form of equitable relief. *Presto-X-Company v. Beller*, 253 Neb. 55, 568 N.W.2d 235 (1997). In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided that where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Bauermeister v. McReynolds*, 253 Neb. 554, 571 N.W.2d 79 (1997). However, on questions of law, an appellate court is obligated to reach a conclusion independent of the determinations reached by the trial court. *Hoiengs v. County of Adams, ante* p. 64, 574 N.W.2d 498 (1998); *State ex rel. Garvey v. County Bd. of Comm.*, 253 Neb. 694, 573 N.W.2d 747 (1998).

## CONSTITUTIONAL PROVISION

In relevant part, article XII, § 8, reads:

(1) No corporation . . . shall acquire, or otherwise obtain an interest, whether legal, beneficial, or otherwise, in any title to real estate used for farming or ranching in this state, or engage in farming or ranching.

Corporation shall mean any corporation organized under the laws of any state of the United States or any country or any partnership of which such corporation is a partner.

Farming or ranching shall mean (i) the cultivation of land for the production of agricultural crops, fruit, or other horticultural products, or (ii) the ownership, keeping or feeding of animals for the production of livestock or livestock products.

. . . .

These restrictions shall not apply to:

(A) A family farm or ranch corporation. Family farm or ranch corporation shall mean a corporation engaged in farming or ranching or the ownership of agricultural land, in which the majority of the voting stock is held by members of a family, or a trust created for the benefit of a member of that family, related to one another within the fourth degree of kindred according to the rules of civil law, or their spouses, at least one of whom is a person residing on or actively engaged in the day to day labor and management of the farm or ranch and none of whose stockholders are non-resident aliens and none of whose stockholders are corporations or partnerships, unless all of the stockholders or partners of such entities are persons related within the fourth degree of kindred to the majority of stockholders in the family farm corporation.

. . . .

The Secretary of State shall monitor corporate and syndicate agricultural land purchases and corporate and syndicate farming and ranching operations, and notify the Attorney General of any possible violations. If the

Attorney General has reason to believe that a corporation or syndicate is violating this amendment, he or she shall commence an action in district court to enjoin any pending illegal land purchase, or livestock operation, or to force divestiture of land held in violation of this amendment. . . .

If the Secretary of State or Attorney General fails to perform his or her duties as directed by this amendment, Nebraska citizens and entities shall have standing in district court to seek enforcement.

## FACTS

Initially, the corporate stock of Progress Pig was owned 80 percent by David Zahn and 20 percent by Kenneth Wamstad, who is not related to Zahn. In the summer of 1994, Zahn became the sole owner of the corporate stock. Progress Pig is engaged in the keeping and feeding of hogs for production of pork and pork products in Otoe County, Nebraska. Zahn does not reside on the Progress Pig farm.

In a June 7, 1991, letter, Jerome Olmsted and Lorraine Olmsted asked the Attorney General to investigate whether Progress Pig was in violation of article XII, § 8. On June 12, Marty Strange sent a similar request to the Otoe County Attorney and the Johnson County Attorney.

On July 29, 1991, the Nebraska Attorney General's office informed Strange that it was disqualified from investigating Progress Pig, as the Attorney General had performed legal services for one of the individuals alleged to have an ownership interest in the corporation. The letter also advised Strange of the citizen standing section of article XII, § 8, and suggested that Strange contact "the appropriate county attorney."

On August 28, 1991, the Attorney General's office wrote to the Otoe County Attorney informing him of the Attorney General's disqualification and mentioning that the Johnson County Attorney also had a conflict of interest. The letter further reads:

> [W]e would respectfully request that you look into the relevant facts regarding Progress Pig, Inc. and [make] a determination as to whether this company is in violation of [article XII, § 8]. Such inquiries are usually initiated simply by contacting the company in question to obtain infor-

mation and documentation regarding compliance with [article XII, § 8].

In reference to this letter, the Attorney General's office wrote to Strange that "[w]e are hopeful that [the Otoe County Attorney] will agree to pursue this matter . . . ."

The Otoe County Attorney asked the Otoe County sheriff's deputy to conduct an investigation, instructing the deputy to " '[g]o to Progress Pig. Determine who lives on property. Interview owners as to who is the corporation, shareholders, where they live. Determine if whoever resides on property is related to any member of [the corporation] or is an actual shareholder.' "

According to the deputy's report, he telephoned the Secretary of State and found that a corporation named Progress Pig was registered and that Zahn and Wamstad were the officers. The report further indicates that on October 16, 1991, the deputy visited Progress Pig and spoke to Wamstad. Wamstad reported that he and Zahn were the sole shareholders, with Zahn owning 80 percent of the shares, and told the deputy that he was the secretary and production manager of Progress Pig and that he resided in the house located on the Progress Pig property. In addition, Wamstad advised the deputy that "Zahn works at Progress Pig, Inc., on a day-to-day basis doing the bookkeeping and other duties." The deputy did not interview Zahn.

In an October 21, 1991, letter to Strange, the Otoe County Attorney wrote the following:

I have had an investigator with the Otoe County Sheriff's Office contact both the Secretary of State's office and go out and visit the location here in Otoe County, Nebraska. According to the investigator's report . . . Zahn performs duties at the hog confinement site located in Otoe County, Nebraska on a day to day basis. Therefore, unless there is some evidence to the contrary, it would appear that the Progress Pig, Inc., operation that is located in Otoe County, Nebraska is operating within [article XII, § 8].

The Otoe County Attorney was not compensated in any way for his involvement.

Although the Otoe County Attorney was not in possession of the following evidence, the information is useful for a clearer

understanding of the Progress Pig operations. Zahn stated in his June 27, 1995, deposition that one Doug Beach manages Progress Pig and oversees the day-to-day operations of the farm. Progress Pig also employs two other full-time employees, Lynn Summers, assistant manager, and Paul Sliger. As for his personal duties, Zahn testified that he meets with Beach in person every Tuesday to discuss the business and that he either calls or visits Beach every Friday for the purpose of setting the pig price for the coming week. Zahn handles "the financial side of things" from his home. Zahn's own records indicate that while he performs bookkeeping, writes checks, talks with Progress Pig's manager, and deals with the bank, he does not regularly work with the hogs.

## ANALYSIS

Unlike the U.S. Constitution, the Nebraska Constitution does not require the existence of an actual case or controversy for jurisdiction to vest in the courts of the state (compare U.S. Const. art. III, § 2). Nonetheless, our case law has required that for there to be an exercise of judicial power, an actual case or controversy must be presented. *In re Petition of Anonymous 1*, 251 Neb. 424, 558 N.W.2d 784 (1997). Standing is a key function in determining whether a justiciable controversy exists. *Mullendore v. Nuernberger*, 230 Neb. 921, 434 N.W.2d 511 (1989).

Under the common law, before one is entitled to invoke a court's jurisdiction, one must have standing to sue, which requires having some real interest in the cause of action; in other words, to have common-law standing to sue, one must have some legal or equitable right, title, or interest in the subject matter of the controversy. See, *In re Interest of Archie C.*, 250 Neb. 123, 547 N.W.2d 913 (1996); *Marten v. Staab*, 249 Neb. 299, 543 N.W.2d 436 (1996). The purpose of a standing inquiry is to determine whether one has a legally protected interest or right in the controversy that would benefit by the relief to be granted. *In re Interest of Archie C., supra; Marten, supra.*

However, the Nebraska Constitution specifically recognizes the right of the people to amend that document, independent of any action by the Legislature, by passing a ballot initiative, the

means by which the subject constitutional language came into being. See, Neb. Const. art. III, §§ 1 and 2; 1982 Initiative Measure No. 300; *Omaha Nat. Bank v. Spire*, 223 Neb. 209, 389 N.W.2d 269 (1986). The people of Nebraska may amend their Constitution in any way they see fit, provided the amendments do not violate the federal Constitution or conflict with federal statutes or treaties. *State ex rel. Stenberg v. Moore*, 251 Neb. 598, 558 N.W.2d 794 (1997). Moreover, in a case involving such a constitutional amendment, it is not the province of this court to judge the wisdom or the desirability of the amendment. *Pig Pro Nonstock Co-op v. Moore*, 253 Neb. 72, 568 N.W.2d 217 (1997).

Pursuant to Neb. Rev. Stat. § 49-101 (Reissue 1993), the common law of England applies in Nebraska "insofar as it is not inconsistent with our statutes and Constitution." *State v. Turner*, 194 Neb. 252, 255, 231 N.W.2d 345, 348 (1975). Here, the common-law rules regarding standing are inconsistent with the provisions of article XII, § 8, which confer upon the citizens of Nebraska standing to seek judicial enforcement of that constitutional provision if the Attorney General "fails to perform his . . . duties as directed" therein. Thus, the common-law rules concerning standing do not apply to this matter.

As a consequence, whether the plaintiffs have standing depends entirely on whether the Attorney General performed his duty under article XII, § 8, to "commence an action" if the Attorney General "has reason to believe that a corporation . . . is violating [the] amendment."

It is clear that the Attorney General's office conducted no investigation, but, instead, looked to the Otoe County Attorney to do so. While article XII, § 8, contains no provision for a county attorney to act in the place and stead of the Attorney General, Neb. Rev. Stat. § 23-1201(2) (Reissue 1991) provides, in relevant part:

> The county attorney may be directed by the Attorney General to represent the state in any action or matter in which the state is interested or a party. When such services require the performance of duties which are in addition to the ordinary duties of the county attorney, he or she shall receive such fee for his or her services, in addition to the salary as county attorney . . . .

In addition, Neb. Rev. Stat. § 84-205(2) (Cum. Supp. 1992) provides that the Attorney General "shall have authority to require aid and assistance of the county attorney in all matters pertaining to the duties of the Attorney General in the county of such county attorney . . . ."

The Attorney General therefore has the authority to discharge the duties imposed by article XII, § 8, by directing a county attorney to act as the Attorney General's surrogate. The questions are whether the Attorney General directed the Otoe County Attorney to so act and whether the county attorney acted as directed.

By simply reading the language employed by the Attorney General in his letters, it would appear that the Otoe County Attorney's involvement in the investigation was optional, for it would seem that one exercising the power to "direct" another to act would not write in terms of being "hopeful that [the other] will agree to pursue this matter." However, the evidence is that the Attorney General's office instructed the Otoe County Attorney as to how to conduct the investigation, that the Otoe County Attorney in fact instructed the deputy sheriff to investigate Progress Pig, and that the Otoe County Attorney determined not to bring an action against Progress Pig based upon that investigation. Regardless of the language employed by the Attorney General's office in its letters, the Otoe County Attorney's actions reveal that he was acting under the direction of and for the Attorney General. The fact that the Otoe County Attorney received no extra compensation, as contemplated by § 23-1201(2), may create an issue as between him and the Attorney General, but it does not negate the facts that the investigation was conducted and the decision was made.

The issues therefore become whether the Otoe County Attorney, as the Attorney General's surrogate, had reason to believe that the Progress Pig operations violated article XII, § 8, and was thus obligated to commence an action in the district court to enjoin them and whether the Otoe County Attorney's failure to commence an action conferred standing upon the plaintiffs to do so.

Like statutes, constitutional provisions are not open to construction as a matter of course; construction is appropriate only

when it has been demonstrated that the meaning of the provision is not clear and therefore that construction is necessary. *Pig Pro Nonstock Co-op v. Moore*, 253 Neb. 72, 568 N.W.2d 217 (1997). Because it is unclear from the plain language of article XII, § 8, whether citizen standing rests upon an attorney general's or his or her surrogate's subjective view of the evidence, construction is appropriate.

Although, generally, the rules governing the interpretation of legislative enactments apply to constitutional provisions adopted by the people, such constitutional provisions are to receive a broader and more liberal construction than statutes. Consequently, constitutions are not subject to rules of strict construction. *Carpenter v. State*, 179 Neb. 628, 139 N.W.2d 541 (1966). Every clause in a constitution has been inserted for a useful purpose and should receive even broader and more liberal construction than statutes. *Jaksha v. State*, 222 Neb. 690, 385 N.W.2d 922 (1986). In determining the intent of a constitutional provision, a court may not supply any supposed omission, add words, or take words from the provision as framed. It must be construed as a whole, and no part will be rejected as meaningless or surplusage if it can be avoided. If the meaning is clear, the court will give to it the meaning that obviously would be accepted and understood by the layperson. *Pig Pro Nonstock Co-op, supra.*

Article XII, § 8, does not provide that the Attorney General shall commence an action if he or she "believes" that a violation has occurred. Rather, the relevant language directs the Attorney General to commence an action if he or she "*has reason to* believe" that a violation has occurred. (Emphasis supplied.) Citizen standing cannot depend on an attorney general's or his or her surrogate's subjective belief. If such were the case, citizen standing would never apply absent the unlikely circumstance wherein an attorney general or surrogate honestly believed that an operation was violating the constitutional provision, but declined to seek to enjoin the violation. Thus, if an attorney general or surrogate has information which would support an objective belief that an operation is in violation of article XII, § 8, and fails to commence an action, Nebraska citizens have standing to seek enforcement in the district court.

The Otoe County Attorney was aware that Progress Pig is a corporation engaged in the production of livestock and that Zahn, the corporation's majority shareholder, did not reside on the farm. In order for the family farm or ranch corporation exception to apply, at least one member of the family holding the majority of the voting stock must either reside on the farm or be "actively engaged in the day to day labor and management of the farm." Wamstad represented that on a day-to-day basis, Zahn kept the books and performed other duties. We need not and do not decide whether performing "bookkeeping and other duties" constitutes labor for purposes of the family farm or ranch corporation exception, since the information obtained during the investigation is such that a reasonable person could conclude that Zahn is not actively engaged in the day-to-day management of the farm. Thus, the Otoe County Attorney possessed information supporting an objective belief that Progress Pig was in violation of article XII, § 8, and failed to seek judicial enforcement of the provision. As a consequence, the plaintiffs have standing to bring this action.

Having so determined, we decline the plaintiffs' invitation that since our standard of review is de novo and the parties tried all of the substantive issues, we resolve those issues. See *Cunningham v. Exon*, 202 Neb. 563, 276 N.W.2d 213 (1979) (declining to make determination on merits after reversing trial court's judgment on issue of standing, despite fact that remaining issues presented questions of law).

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

WHITE, C.J., concurs.

CAPORALE, J., concurring.

Although I agree that the plaintiffs have standing and that the cause is to be remanded to the district court, I write separately, for it seems to me the majority's opinion implies that this court possesses the authority to have reviewed the cause on the merits had it elected to do so. I respectfully submit that under present law, no such authority exists.

Neb. Rev. Stat. § 25-1925 (Reissue 1995) provides that an appellate court, in its appellate review of suits in equity, shall review de novo those "findings of fact of the district court"

which an appellant seeks to have reviewed. Thus, § 25-1925 limits the scope of our de novo review of factual issues to the findings of fact of the district court. It does not empower us to make original factual findings with regard to issues not reached by the district court.

In keeping with that statutory provision, we have written in equity actions that an appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial tribunal. E.g., *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997) (action in equity to impose constructive trust); *Robison v. Madsen*, 246 Neb. 22, 516 N.W.2d 594 (1994) (action in equity to foreclose mechanic's lien); *How v. Mars*, 245 Neb. 420, 513 N.W.2d 511 (1994) (action in equity to void election of directors); *Beaver Lake Assn. v. Sorensen*, 231 Neb. 75, 434 N.W.2d 703 (1989) (action in equity to enforce covenants and restrictions on real property); *State v. Merritt Brothers Sand & Gravel Co.*, 180 Neb. 660, 144 N.W.2d 180 (1966) (action in equity to enjoin land use).

Indeed, we addressed the limits of appellate review of factual determinations in equity actions even prior to the enactment of § 25-1925 and over 100 years ago in *Coombs v. MacDonald*, 43 Neb. 632, 62 N.W. 41 (1895). The plaintiff therein brought an action in equity to enjoin the defendant from removing garbage under a contract which the plaintiff claimed was entered into pursuant to a void ordinance. The plaintiff alleged that the contract was procured through bribery and other unlawful and corrupt means and that it contravened settled rules of public policy. In perpetually enjoining the defendant from interfering with the plaintiff, who was also engaged in the business of removing garbage, the district court ruled that the contract and ordinance on which it depended contravened public policy, and expressly reserved any decision as to whether the contract was procured by fraud. This court concluded that the contract was not void as being against public policy, reversed the judgment of the district court, and remanded the cause for further proceedings. In refusing to consider whether the contract had been procured by fraud, we wrote: "It is a rule of universal application to appellate proceedings that the examination by the reviewing court . . . will be confined to issues determined by the court of primary

jurisdiction." *Id.* at 633, 62 N.W. at 42. We most recently reiterated this language in *Edgerton v. Hamilton County*, 150 Neb. 821, 36 N.W.2d 258 (1949) (declaratory judgment action to determine exemption of homestead from claims of creditors in estate proceeding).

It seems to me that if a majority of this court is of a mind to expansively construe § 25-1925 and overrule precedent which is over a century old, it ought to do so directly and not by implication.